## THE DIRECTOR.

### BALFOUR et al. v. THE DIRECTOR.

*(District Court, D. Oregon. February 18, 1888.)*

1. SHIPPING—CHARTER-PARTY—SEAWORTHINESS.

    There is an implied warranty of seaworthiness or fitness for the contemplated voyage in every charter-party or contract of affreightment on the part of the ship-owner, and this is a condition precedent to performance by the shipper.[1]

2. SAME.

    The libelants chartered the Director to carry a cargo of wheat from Portland to Europe, and, when she was loaded, she commenced, from inherent weakness, to leak, so that her cargo had to be discharged. *Held,* that the vessel not being seaworthy at the date of the charter and the delivery of the cargo, there was a failure on the part of the ship-owner to perform the condition precedent of the contract, and the shipper was absolved therefrom, and was entitled to recover possession of his wheat, and such damages as he may have sustained by reason of such failure.

3. MARITIME LIENS—SALE OF VESSEL—ORDER OF PAYMENT.

    Assuming that the proceeds of the sale of the vessel are not sufficient to satisfy the demand of the libelants and those of the intervenors, the stevedore who unloaded the cargo, having a lien on both cargo and vessel for his services, is entitled to be first paid; the claim for towage up the river to Portland, and the claim of the libelants for damages for breach of the contract, are to be paid *pro rata,* the costs incurred by the libelants in arresting and keeping the vessel to be first paid in full; the carpenter who recalked and coppered the vessel after the cargo was removed from her, his labor and material being of no benefit to the prior lienors, must be paid last.

4. ADMIRALTY—REPLEVIN—COSTS.

    In a suit in admiralty for the possession of personal property, where the same is taken on process issued on the application of the libelants, the same should be delivered to them; and, therefore, if they procure the arrest of the property and leave it in the custody of the marshal, they cannot recover the cost and expense of such custody, either as damages or costs.

*(Syllabus by the Court.)*

[1] Under the usual covenants of a charter-party, that the vessel is "tight, stanch, and strong," the owners are answerable for latent as well as visible defects whereby the cargo is damaged. Hubert v. Recknagel, 13 Fed. Rep. 912; The Rover, 33 Fed. Rep. 515.

The terms "tight, stanch, strong, and every way fitted for the voyage," include an implied warranty of the seaworthiness of the vessel at the time she sails for the particular voyage, and in respect to the cargo laden on board. Sumner v. Caswell, 20 Fed. Rep. 249; The Vesta, 6 Fed. Rep. 532.

The law places on the owner of the vessel the obligations of a warrantor. The charter-party declaring that the vessel was in good order and condition, the presumption is in favor of seaworthiness. McCann v. Conery, 11 Fed. Rep. 747; Pyman v. Von Singen, 3 Fed. Rep. 802.

The stoppage of a steamer for five hours at a port not out of her course, for the purpose of taking in a small additional quantity of coal, is not a violation of a provision of the charter-party representing that the steamer was in every way fitted for the voyage. Von Lingen v. Davidson, 1 Fed. Rep. 178.

In Admiralty.
*C. E. S. Wood* and *John W. Whalley*, for libelants.
*Frederick R. Strong*, for claimants.
*Robert L. McKee*, for intervenors.

DEADY, J.  This suit was brought by the libelants, Alexander Balfour, Stephen Williamson, Robert Balfour, Alexander Guthrie, and Robert B. Foreman, doing business in this port as Balfour, Guthrie & Co., against the British bark Director, her master, William D. Bogart, and 16,868 bags of wheat.

The libel prayed for process against said bark, wheat, and master, to the end that the first might be sold to pay the damages of the libelants; that the second "might be delivered to the libelants," free of all charges and liens; that the master may be restrained from interfering with the wheat during the pendency of the suit; and that he and all others claiming any interest in said vessel or wheat may be cited to appear and answer the libel.

On reading and filing the libel an order was made thereon, allowing process to issue, as prayed for in the libel, on the filing of a stipulation by the libelants, in the sum of $50,000, as security to the adverse parties for costs and damages thereby incurred, on which the vessel and wheat were subsequently arrested, and all parties in interest cited to appear.  Thereupon the master filed a claim of ownership of said vessel on behalf of William W. Turnbull and others, and, on the same day, said parties and the master appeared in the suit, by counsel, and claimed the possession of the wheat.

The libel alleges that on October 3, 1885, the master of the Director chartered her to the libelants to carry a cargo of wheat from this port to Europe, at 42s. 6d. a ton, stating therein that the vessel was "tight, stanch, strong, and in every way fitted for such voyage;" that the vessel was laden by the libelants, and, as soon as the cargo was on board, she commenced to leak so badly she could not proceed on her voyage, and the cargo was discharged.

On exceptions to the libel for misjoinder of causes of action, it was held—

"(1) In a suit by a shipper for the non-performance of a contract of affreightment, the facts which establish the liability of the master, also give the libelant a lien on the vessel for the amount of his claim, and, therefore, it is proper and expedient that the proceeding against the owner or master and the vessel should be joined in one libel;" and "(2) when the possession of personal property has been changed by means involving the breach of a maritime contract concerning the same, or such possession is wrongfully withheld contrary thereto, the owner or other person entitled, under the circumstances to the possession thereof, may maintain a suit in admiralty to obtain the same." The Director, 11 Sawy. 493, 26 Fed. Rep. 708.

An amended libel was subsequently filed, in which a sale of the wheat, on October 5, 1885, is alleged to have been made to Arthur Bald of Liverpool, at 36s. 9d. per 500 pounds, including freight and insurance,

to be shipped from this port during the month of October or November of that year by the Director, she being "a first-class wooden vessel" and fit to carry said cargo, and the loss of the same by reason of the inability of the Director to carry the wheat as per the terms of the sale and the stipulation of the charter-party, to the damage of the libelants $3,036.

On May 31, 1887, the master and claimants answered the libel, admitting the making of the charter-party, and the loading and unloading of the cargo, as stated in the libel, and allege that the master, after discharging the cargo, had the Director hove down and repaired, so that she was ready to receive the wheat again before the expiration of November, and fit to carry the same to its destination, as per the charter-party.

In the course of the trial the claimants offered in evidence copies of the Bureau Veritas, or the French Lloyds, for the years 1884 and 1885, to show the character and construction of the Director, in connection with evidence tending to show that the libelants' agent at this port, Mr. Walter J. Burns, was familiar with these registers at and before the chartering of the Director, and was therefore chargeable with a knowledge of the facts therein stated concerning the Director. They were admitted, without objection, for whatever they might prove.

These registers, so far as the libelants are concerned, are mere hearsay, derived from local surveys and inspections made at the instance of the owners, and usually in their interest. Judging from what I have seen of such surveys in this case, they are of little or no value as evidence of the true condition of a vessel. Underwriters, from their vocation and business, may be presumed to have a knowledge of their contents. Whart. Ev. §§ 735, 1243. But as to others not so related to the subject, such presumption does not obtain. 1 Whart. Ev. § 639.

And, so far as these libelants are concerned, they are not evidence of any fact about which there is any doubt or controversy in the case.

Assuming, however, that the agent was familiar with these volumes of Veritas, the information imparted to him by them was to the effect that the Director was a first-class wooden vessel, built in 1873, in New Brunswick, principally of spruce, birch, pitch-pine, and hackmatack, with a character rated at 3 | 3, A 1. 1., and about five years of life before her, the last survey having been made at Liverpool in 1883. And this, of course, does not tend to show, as maintained by counsel for the claimants, that the agent of the libelants must or could have known that the Director was not a first-class wooden vessel, but the contrary.

Certain certificates of survey of the Director, made in this port, were also offered in evidence by the claimants to prove the seaworthiness of the vessel, as well as an authenticated copy of a survey purporting to have been made in Hong Kong, just prior to her departure from that port for this, Libelants objected, and they were admitted subject to the objection. The objection is well taken. The certificate of the survey of a vessel is *ex parte*,—mere hearsay,—and is not evidence of the facts contained in it in favor of the person procuring it, whatever it may be when offered against him. *Hall* v. *Insurance Co.*, 9 Pick. 476; *Watson* v. *Insurance Co.*, 2 Wash. C. C. 152; *Cort* v. *Insurance Co.*, Id. 375; *U.*

*S.* v. *Mitchell*, Id. 478; *Saltus* v. *Insurance Co.*, 10 Johns. 489; *Abbott* v. *Sebor*, 3 Johns. Cas. 46; 1 Whart. Ev. § 120.

Such certificate is evidence of the fact that a survey was made, and, when a question arises as to the propriety or necessity of a sale by the master of a stranded or injured vessel in pursuance of such a survey, it may be evidence of the facts contained therein, tending to justify the action of the master. But even then it is not conclusive, and may be contradicted. *Gordon* v. *Insurance Co.*, 2 Pick. 263.

In this case the proper proof of the facts ascertained on the surveys of the Director is the testimony of the surveyors. In the case of *The Fortitude*, 3 Sum. 262, the surveyors appear to have been examined as witnesses. But the certificate of the survey, dated November 25, 1885, and signed by Nathaniel Ingersoll and John E. Lombard, is competent evidence to qualify the testimony of said Lombard concerning the condition of the vessel at that time, as a statement made by him out of court.

The evidence on the point of unseaworthiness includes, among others, the master, the first and second mate, the carpenter, and one of the crew, The first mate left the vessel on October 7th, and is a witness for the libelants; the others remain with the ship, and testify for the claimants. A number of ship-masters, mostly British, testify as to what leakage will render a vessel unseaworthy. Most of them seem to think a vessel is seaworthy so long as her pumps can keep down the leak. "Seaworthy" is doubtless a relative term, depending on the voyage and cargo. Where the cargo is wheat, and the voyage from this port to Europe, around Cape Horn, a vessel, to be seaworthy, must be tight and strong, and not leak through any inherent weakness.

As usual, in this class of cases, the evidence is very conflicting. On a careful consideration of it, and the degree of credit to be given to the witnesses, I find the facts to be as follows:

The Director is a wooden vessel of 679 tons register, built principally of spruce, pine and hacmatack, at Moss Glen, New Brunswick, in 1873, and classed in Veritas 3 | 3 A 1. 1 for six years from July, 1883, and when she was docked and remetaled. About the middle of March, 1885, she sailed from New Castle, New South Wales, to Amoy, China, with a cargo of coal. On May 17th she left the latter port, in ballast, for Hong Kong, from whence on June 30th she sailed for Portland with a cargo of China goods, principally rice, and reached here on September 11th of the same year.

On the voyage to Amoy she encountered a gale off the Solomon Islands, during which she leaked so that the pumps were used continuously. On the voyage from Hong Kong to Portland the weather was very good, except for a couple of days while in the Bashee channel, when there was an ordinary fresh gale, during which the vessel leaked not less than six inches per hour, and for the rest of the voyage not less than three inches per hour. On her arrival at Portland the master reported to his agents that the vessel was leaking, whereupon a survey was ordered, in pursuance of which, the cargo being discharged, she was first put by the head, and some small repairs made about her stern-post, and then by the stern, and similar work done about her stern-post; and on October 1st the surveyors reported her leak reduced to

9-100 of an inch per hour, and that she was "fit to carry a dry and perishable cargo to any part of the world."

On October 3d the Director was chartered to the libelants to carry a cargo of wheat from this port to Europe, at the rate of 42s. 6d. per ton. The charter stated that the vessel was "tight, stanch, strong, and every way fitted for such a voyage." And, among others, it contained the following stipulations· That the vessel would furnish the charterers a certificate from their surveyor "that she is satisfactory to him as regards general condition, stowage, dunnage, draft of water, and ventilation;" that, should she fail to pass satisfactory survey, or be unreasonably detained in consequence of having to dry-dock for repairs, this charter to be void at charterer's option;" that lay days shall commence 24 hours after discharge of inward cargo, and the master reports that he is ready to receive cargo, and "ten working lay days" be allowed for loading.

Between October 3d and 8th the vessel was loaded with wheat by libelant, the same weighing 985 long tons. The cargo was consigned to the order of libelants, and the usual bills of lading taken from the master in their own name, whereby the master admitted the receipt on board, in good condition, of 16,868 bags of wheat, to be delivered at a port in Europe in like condition.

On October 8th, Nathaniel Ingersoll, surveyor for the libelants, reported that "this cargo of wheat in sacks has been properly dunnaged under my direction," and "this vessel is properly ventilated, and is in good condition to carry a dry and perishable cargo to any port of the world."

On the morning of October the 9th as the vessel was about to leave her dock and proceed to sea, it was discovered that she was leaking, and had an unusual quantity of water in her hold, when a survey was had, on the request of the master. On the 10th the surveyors, Nathaniel Ingersoll and John E. Lombard, reported that she was making a little over an inch of water an hour, and advised that her cargo be partially discharged and "the upper course of copper be turned down and the ship's top sides be thoroughly calked to the plank sheer."

In consequence of this leak and survey, the cargo was wholly discharged and placed on the dock, and, on October 26th a contract was made with Robert McIntosh for the repair of the vessel, at a cost of $1,485, the same to be braced, shored, and hove down on either side so as to expose the keel, and calked, coppered, and otherwise repaired as the surveyors might direct, so as to render her seaworthy.

On November 13th and 16th she was hove down, first on her starboard and then on her port side, and stripped of her sheathing, when it was found that her seams were slack, so that you could put your hand in them; the oakum was wet and sodden, coming away with the sheathing and dropping out of the seams. The keel was badly broomed and split, 35 feet by 9 inches of which was taken out at the center and replaced with Oregon fir. One butt was started on the starboard side, and, when she was hove down, the water came in under her covering boards, fore and aft. in great quantity. The vessel was recalked and recoppered, the butt fastened, and brought back to her loading berth, where her top sides were calked. On November 21st, on the request of the master, a survey was ordered, and on the 25th the surveyors last aforesaid reported that the vessel was then "tight, stanch, and in good order to carry a dry and perishable cargo to any part of the world."

Ingersoll died before the testimony was taken, and Lombard testified that he signed the report with much hesitation, and that he was then satisfied that the vessel was not seaworthy, or fit to carry this cargo of wheat to Europe; and, on November 27th, the master informed the libelants that he was ready to reload the cargo.

In the mean time the libelants on October 8th, had sold the cargo of wheat through their Liverpool house, to Arthur Bald of that place. The contract

of sale provided that the wheat was the average of the Walla Walla crop of 1885, and was "to be shipped per Director, 679 T. R., a first-class wooden vessel, classed not lower than A1, English or 3 | 3 1. 1, French Veritas, * * * as per bills of lading, to be dated during October and (or) November, 1885, * * * at the price of 36s. 9d. per 500 pounds."

On the delivery of the bills of lading October 8, 1885, the libelants drew on the purchaser for the price of the cargo, appending to the bill of exchange the bills of lading and the policy of insurance of the cargo,—the libelants being the underwriters,—and negotiated the same with the bank of British Columbia, in this city. After learning the condition of the vessel, and the unlading of the cargo, Mr. Bald repudiated the sale because of the breach of the condition precedent thereto—that the Director was seaworthy. This determination following, as it did, on some correspondence between the parties, was made known to the Liverpool house on October 28th, and by them to the Portland branch early in November, the bills of lading being remailed to the latter on November 14th.

On November 7th the Portland agent of the libelants wrote to the master, stating that he held him, his vessel, and his owners liable for all losses sustained on the cargo of wheat, on the ground of a breach of the warranty contained in the charter, that the Director was seaworthy.

Between October 9th and the date of this notice there was correspondence and conversation between the libelants and the ship's agents, Messrs. Taylor, Young & Co., as to the rights and obligations of the parties to the transaction,—the former claiming the return of the wheat free and clear of all liens and charges, while the latter was willing to cancel the charter-party if the libelants would bear the expense incident to the unlading and rescission of the contract.

The parties were unable to agree, and the master insisted on holding the cargo, and thereupon this suit was commenced, on November 23d, to obtain possession of the wheat and damages for the failure to perform the contract of affreightment, in which the vessel was arrested on November 25th, and the wheat on November 28th.

Afterwards the following persons intervened for their interests, and exhibited libels in the cause: Robert McIntosh, ship carpenter, on January 16, 1886, against the vessel, for the sum of $4,537 for materials and labor expended in the repair of the same after the wheat was unladen, and prior to the survey of November 25th; Richard Lemon, stevedore, on January 23, 1886, against the vessel and cargo, for the sum of $492.50, for unloading the latter from the vessel preparatory to the survey of October 10th, and the Vancouver Transportation Company, a corporation formed under the laws of Washington territory, on March 4, 1886, against the vessel, for the sum of $405, for towage up the river on the inward-bound voyage.

On the arrest of the wheat the possession of the same was not claimed by the libelants, and it remained in the custody of the marshal. Neither did the claimants make any application for the delivery to them of the vessel, and it also remained in the custody of the marshal. On May 1, 1886, on the application of the libelants, and the consent of the claimants, an order was made for the sale of the wheat, and, at the same time, on the application of the claimants and the consent of the libelants, an order was made for the sale of the vessel; and, in pursuance thereof, on May 18th the vessel was sold to the agents of the claimants, Taylor, Young & Co., for the sum of $3,000, and the wheat to C. Cæsar & Co. for $1.17½ per cental, or the sum of $26,282.76, which sum, less $2,522.46; the marshal's costs and expenses, was paid into the registry of the court. On December 10, 1887, in pursuance of an order made on the application of the libelants, the clerk paid over to the latter $24,-032.76 of the amount, leaving in the registry of the court, as the representative of the vessel, the sum of $2,727.54.

In considering the question of the seaworthiness of the vessel, but little, if any, weight has been given to the testimony of the master. His conduct throughout renders him, in my judgment, unworthy of credit. It is not necessary to go into details, and one transaction will suffice to show his want of integrity. Although he admits that the vessel made not less than three inches of water any hour between Hong Kong and this port, the log kept by the mate, under his special direction, does not refer to any leak. After the arrival in this port, however, he had the mate write up a new log, in which it was falsely represented that during the 2d, 3d, and 4th days of July the vessel was in a hurricane, with a cross-sea boarding her fore and aft, and making so much water, without stating the amount, that it was impossible, on the 2d, to keep her free with one pump, when the fact was that the vessel experienced no rough weather on the voyage, except a moderate gale in the Bashee channel, where she did not make more than seven inches of water an hour. This manufactured log was produced to the British consul as the true log, and was made under the apprehension that the cargo was more or less damaged, as a basis of protest against the vessel's liability therefor. However, the cargo came out dry, and no further use was made of it.

My conclusion is that the vessel, at the date of the charter, was altogether unseaworthy, considered with reference to the cargo she was to carry, and the voyage she was to make. She was structurally defective and inherently weak, was poorly fastened and leaked all over. Caulking did her but little good. She was repaired, according to Veritas, in 1883, and yet, when the copper was stripped off of her in 1885, the oakum in her seams was so loose and water-soaked that it came away without any apparent resistance. This shows that when the vessel was in motion with a cargo on board, her timbers were working, so as to open her seams, whereby the water passed through until the oakum became sodden and loose. The leakage was not the result of any local defect or injury, that could be stopped by some specific repair, and the flow of which was uniform in all weathers, and could be counted on with some degree of certainty, without reference to wind or wave, and provided against accordingly.

She must have worked more or less all over, like a crate or basket, when subject to a strain. The leak fluctuated, the amount depending on her depth in the water, and the state of the weather. Lying in still water, at her dock, in ballast, she might not leak over an inch an hour, but in fair weather, when loaded and under sail, the leak would be not less than three inches in the same time, while in tolerably rough weather it would increase to not less than six inches an hour, and to what volume it might reach, would simply depend on the condition of the wind and waves, and how much strain she would bear without filling or going to pieces.

Nor was the vessel seaworthy after the repairs made in this port. She was inherently weak, and this was a defect that calking and coppering would not cure. It was like patching old cloth with new. Nothing short of rebuilding would have made her fit to carry this cargo of wheat

round Cape Horn to Europe. To be seaworthy, the vessel should also have been properly officered and manned, so that insurance could have been effected on her cargo. The libelants were the underwriters of this cargo, and, on November 27th, when the vessel was tendered to them as repaired, they had reason to apprehend that it was unsafe to trust the master with this cargo. He might put in some port on the way, and falsely represent that his vessel had been injured at sea, and have her rebuilt at the expense of average on the cargo..

And the small price which the vessel brought when sold here, clear of all liens and claims, shows that she was not considered fit for the wheat trade. Shipping wheat to Europe is the principal business of this port, and many British subjects are engaged in it. The British port of Victoria is also near at hand. All the facts of her condition and career had become well known here, and still she only sold for $3,000,—a sum considerably less than the cost of the repairs just put on her,—and her owners appear to have been the purchasers even at that price. She finally left this port in July with a cargo of lumber for Shanghai, and it is since understood that she was lost somewhere down that coast. The reasonable inference is that she at last went out with a cargo of lumber because she could not get one of wheat.

The representation in the charter that the Director was then "tight, staunch, strong, and every way fitted for such voyage," is a warranty to that effect; and if the charter was silent on the subject, the law would imply as much. Seaworthiness is a condition precedent to every charter or contract of affreightment, and, where there is no express warranty to that effect, the law implies one.

The authorities concur in holding that, where there is no express agreement to the contrary, the owner warrants the ship to be seaworthy, and at the time fit in all respects to carry the cargo described in the contract to the port or place therein specified. *Work* v. *Leathers*, 97 U. S. 379; *Wilson* v. *Griswold*, 9 Blatchf. 269; *The Vesta*, 6 Fed. Rep. 532; *Davison* v. *Von Lingen*, 113 U. S. 41, 5 Sup. Ct. Rep. 346; *The Northern Belle*, 9 Wall. 526; *The Tornado*, 108 U. S. 342, 2 Sup. Ct. Rep. 746.

In *Work* v. *Leathers*, *supra*, Mr. Justice SWAYNE, speaking for the court, says:

"Where the owner of a vessel charters her or offers her for freight, he is bound to see that she is seaworthy and suitable for the service in which she is to be employed. If there be defects, known or not known, he is not excused."

Therefore it makes no difference, so far as the libelant's right to repudiate this contract of affreightment and be restored to the possession of their wheat is concerned, whether the vessel was seaworthy on November 27th or not. The undertaking of the claimants was that she was seaworthy at the date of the charter and the commencement of the loading. This was a condition precedent to their right to the possession of the wheat for the purpose of earning freight in carrying it to its destination.

The clause in the charter, "should the vessel fail to pass satisfactory survey, or be unreasonably detained in consequence of having to dry-

dock for repairs, this charter to be void, at charterer's option," has been referred to as excusing the delay for repairs at this port. But certainly the detention contemplated in this clause must occur after the voyage has commenced. The survey, of course, was to take place in this port, and before loading, and, if unsatisfactory, the libelants might then have declared the contract off, and if, after the voyage had commenced, she had been detained for the cause mentioned, they might then have declared the contract void, and resumed the possession of their wheat.

Admitting, however, that the detention in this port after the unloading of the cargo was a detention within the purview of this clause, it is not apparent how this helps the case of the claimants, for the libelants, in their letter of November 7th, written after the contract for repairs was made, but before the work was commenced, in effect declared the contract off, and gave the claimants notice of their intention to hold them liable for the breach of warranty of seaworthiness.

The libel alleges, among other things, that the libelants were induced to enter into the charter-party by the fraud of the master, and they ask to have it declared void, on that account. The defense insists that the whole case of the libelants rests on this allegation, and contend that the proof of fraud is not sufficient, and, therefore, the libel must be dismissed. But the libelants are entitled to such relief as the facts stated in the pleadings and established by the proof will warrant.

In this case it is alleged and proved that the claimants failed to keep the condition precedent of their contract—to furnish a seaworthy vessel in all respects fitted to carry a cargo of wheat from this port to Europe, with reasonable safety and dispatch. This absolved the libelants from the performance of their part of the contract, and entitled them to the return of the cargo, and damages for the failure and delay. And it matters not whether the master or owners knew of the unseaworthiness of the vessel or not. They undertook absolutely to furnish in the Director, neither a soft or hardwood vessel, but one "tight, stanch, strong, and in in every way fitted" for the contemplated voyage—in other words, a first-class wooden vessel. Their ignorance of the fact of her unseaworthiness does not excuse them for a violation of such undertaking. Nor does the fact that any rumor or gossip in shipping circles in this port that may have come to the ears of the libelant's agent, to the effect that the Director was a leaky vessel, or any knowledge which he may have derived from Veritas that she was built principally of soft wood, qualify the claimant's warranty, or estop the libelants from claiming the benefit thereof.

Therefore I do not consider it necessary to go into the question of the fraudulent conduct of the master in the negotiation of this charter-party. But if I did, and the fact that he was aware of the condition of the vessel, and intended and endeavored to conceal the same from the charterers and the public, constitutes such conduct, there would be no difficulty in deciding the question in favor of the libelants.

A question is made by the claimants that the wheat belongs to Bald of Liverpool, and that the libelants have no property in it, and cannot,

v.34F.no.1—5

therefore, maintain any suit about it. My conclusion, as already expressed, is that the sale to Bald fell through because the Director was not a first-class wooden vessel—that being a condition precedent of the contract of sale. Bald testified that he repudiated the sale, as in my judgment he had a right to do. Then, by an arrangement between the parties in Liverpool, the bills of lading were returned here to the agent of the libelants for the purpose of enabling him to take such action in regard to the wheat as he might think best. And the agent, who appears to have become a partner with the libelants since the date of this transaction, swears positively that the wheat belongs to the libelants.

It is true that Guthrie, one of the partners in the Liverpool house, testifies that he had never formally released Bald from the contract of sale, and if he had any claim against him on that account, he expected to enforce it. And it is on this expression of what Guthrie would, rather than what he could, the argument against the right of the libelants to maintain this suit is based.

Admitting, however, that the general property in the wheat is in Bald, the libelants hold the bills of lading with his consent, and for his interests, if he has any. In *Houseman* v. *The North Carolina*, 15 Pet. 49, Chief Justice TANEY, delivering the opinion of the court, said: "We consider it well settled, in admiralty proceedings, that the agent of absent owners may libel either in his own name as an agent, or in the name of his principals, as he thinks best." And the holder or indorsee of a bill of lading, though not the beneficial owner of the property, may sue for the non-delivery thereof in his own name. *The Thames*, 14 Wall. 108; *The Vaughan*, Id. 266.

The libelants are entitled to recover the possesson of the wheat, or its money representative, in the registry of the court, with damages for the violation of the contract of affreightment. The damages claimed by the libelants are as follows: For the difference between the price brought by the marshal's sale and that for which it was sold to Bald, $2,981.05; insurance, $350; and wharfage, $1,100.

These claims cannot be allowed to this extent. In my judgment the libelants, on filing their bond, as they did, for the arrest of the wheat, could have had the immediate possession of the same if they desired it. At least they might have specially applied for the delivery of the same or for the sale of the property, as they did later on, and have saved the greater part of the insurance and wharfage. I know that it is said that the claimants played the dog in the manger policy, and would not consent to a sale until they wanted an order for the sale of the ship. But it is none the less certain that if application had been made by the libelants the court would have ordered the marshal to turn over the property or to sell the same, and deposit the proceeds in the registry of the court. The damages must be therefore reckoned on the base (1) of the difference in the price of wheat at the date of arrest and that to be paid by Bald; and (2) the amount of insurance and wharfage incurred on account of the wheat from the time it was delivered to the master and replevined by the marshal. There is no proof as to what was the price of wheat at this

date, or what was the amount incurred for insurance and wharfage. And, unless the parties can agree as to these facts, the case must be referred to a commissioner to take testimony on these points. For whatever may be found due the libelants under these heads, within the limitation suggested, they are entitled to a decree against the vessel or its proceeds.

Assuming that the fund in the registry of the court is not sufficient to pay the claims of the intervenors and libelants in full, what are the priorities, if any, between them. The claims all rank as maritime liens, but the time and circumstances under which they arose may affect their priority. The claim of the stevedore is for a maritime service rendered to both cargo and vessel, and therefore he has a lien on the proceeds of both for the amount thereof. *The Canada*, 7 Sawy. 173, 7 Fed. Rep. 119. As between the vessel and the cargo the former is primarily liable for the claim. It is not an expense incurred during the voyage, which might be the subject of average between the vessel and the cargo. It arose before the vessel had left her dock, and, by reason of her unseaworthiness, at the date of the charter. The claim must be first paid out of the proceeds of the vessel, and I think it ought to bear interest.

The claims of the transportation company and the carpenter are not made against the cargo.

The only objection that can be made to the payment of the former *pro rata* with that of the libelants is that the service was rendered on a prior voyage,—the inward bound one,—and it is therefore stale and ought to be deferred to the liens accruing since. I think it would be a harsh application of the rule which prefers a claim arising during a later voyage to one arising during an earlier one, to treat the towage of a vessel up the river to this port as a service rendered on an earlier and different voyage from the return one down the river. I think the coming up and going down the river, so far as towage is concerned, where there is only the usual delay in getting and taking on cargo, ought to be considered one voyage. This claim will be paid *pro rata* with the damages found for the libelants. Taxable costs and disbursements will be allowed on each of the claims as a part of it; but the costs made by the libelants in arresting and keeping the vessel, having been incurred for the benefit of all the claims, must first be paid in full.

The claim of the carpenter must be deferred to the last. He was employed by the agents of the vessel, and doubtless looked through them to the owners for his pay. The repairs were made after the other liens had attached. They were made to enable the vessel to commence her voyage, and not to continue it after it had been commenced. Nor were they made for the benefit of the prior lienors.

The claim made by the claimants for demurrage while the vessel was in the custody of the law, at four pence per ton per day, the rate prescribed in the charter in case the vessel was detained by the fault of the libelants, is not supported by either the pleadings or proof. The detention was not caused by the default of the libelants, but that of the claimants. And if this were otherwise, I doubt if the claimants could leave the vessel in the custody of the law, when she might have been delivered

to them on bond or sold, and then claim demurrage for such detention. This, it seems, would be taking advantage of their own wrong or negligence.

A decree will be entered in accordance with this opinion.