### THE NELLIE FLOYD.

#### (District Court, E. D. North Carolina. May 27, 1902.)

1. SHIPPING—CARRIAGE OF GOODS—IMPLIED WARRANTY OF FITNESS OF SHIP.

In the absence of express contract, there is an implied warranty on the part of the shipowner, in every contract for the carriage of goods by sea, not only that the ship is seaworthy in a general sense at the beginning of the voyage, but that she is seaworthy for the particular voyage and cargo.

2. SAME—EXEMPTIONS IN BILL OF LADING.

Stipulations in a bill of lading against liability for loss or damage to cargo through dangers of the sea or leakage do not exempt the shipowner from liability for damage caused by seawater which enters through the deck by reason of its defective condition, which renders the vessel unseaworthy for the particular voyage and cargo.

3. SAME—DAMAGE TO CARGO—UNSEAWORTHINESS.

A schooner contracted to carry a cargo of cement from New York to Wilmington. On the voyage she encountered some weather in which seas washed over her deck, but no worse than was to be anticipated

on such voyage at that season. She was properly and carefully navigated. On arrival at Wilmington a portion of the cement stowed between-decks was found to have been rendered worthless by water, either seawater or rainwater, which entered through the upper deck, the seams in which had not been calked for some eight or nine years, and were in such condition as to permit any water falling on the deck to leak through. *Held*, that the damage was due to unseaworthiness at the beginning of the voyage, for which the owner was liable.

In Admiralty. Action to recover damages for injury to cargo.

Geo. Rountree and Carr, Empie & Empie, for libelants.

Thos. Evans, for respondents.

PURNELL, District Judge. On the 10th day of March, 1902, the schooner Nellie Floyd cleared from New York laden with 8,000 bags and 1,000 barrels of cement, consigned to the Coal & Cement Supply Company, Wilmington, N. C., at which last port the said schooner arrived on or about the 20th day of March, 1902, and discharged her cargo, on which the freight was paid. After the landing of the cement on the wharf, and before it was checked up, it was discovered to have been damaged,—62 barrels and 1,881 bags found to be worthless; and for this damage the libel was filed against the schooner for $936.65. Demand was made and payment refused.

The vessel was originally a three-masted schooner with a centerboard. The centerboard had been removed, and the schooner converted into a keel vessel. The cargo below the decks was sound and uninjured, but the cargo between-decks was wet by water, whether from the sea or otherwise does not appear, by which it had been set, and rendered worthless. It appears from the testimony, and is found as a fact, that as to the hull, rigging, and equipment of the ship she was stanch and seaworthy, though she had not been calked since 1893,—eight or nine years. The calking in the seams of the upper deck was rotten and soft, and a pocketknife could with ease be run in the seam. Water (rain) was dripping through the seams of the upper deck of the schooner the day she arrived in Wilmington and was surveyed, and the water was leaking into the cabin and through the upper deck, where the cargo between-decks was stowed. On her voyage the schooner encountered two storms or blows, during which she shipped seas freely. By the first she was required to return to Delaware Breakwater, and remain for two days. The other was off Cape Hatteras.

The defect in the upper deck existed at the time the schooner cleared at New York, and the weather encountered both on the Delaware and North Carolina coasts was such as every mariner expects on this voyage. For a load of lumber or merchandise, not subject to injury by water, the ship may be said to be seaworthy, but she was old, having been built in 1879. The hatches were properly battened down and dry. The cargo was damaged between-decks. The vessel, after leaving Wilmington, went to Georgetown. Sixty-one barrels damaged are not included in the 100 barrels, invoiced as stained outside. The vessel had no rating for underwriters' insurance.

The gravamen of the contention of libelant is, not that the vessel was generally unseaworthy, but that she was unseaworthy for the

116 F.—6

cargo of cement. The limited liability act of 1851 does not apply, and is improperly pleaded, for there is no complaint as to the navigation of the ship. The master was skillful in managing her,—abundantly cautious. When the weather was threatening and the storm signals displayed he ran back 30 miles to Delaware Breakwater, where he remained for two days. No blame can attach to him or his management; nor does it appear the damage resulted from the dangers of the sea,—it may have done so,—but from a defect in the vessel; a neglect to have the upper deck properly inspected and calked for the particular cargo about to be shipped. There is an implied warranty, if not expressed, on the part of the shipowner, in every contract for the carriage of goods by sea, not only that the ship is seaworthy when she breaks ground and ships cargo, but that she is seaworthy for the particular voyage and cargo. This means more than the bare words, i. e., she was safe for the crew to venture to sea on. As the master aptly testified, if the vessel had not been seaworthy he would not have risked his life on her down the coast, around Hatteras. But as between ship, owner, shipper, and consignee it means, as said before, she is seaworthy for that particular voyage and cargo; that she can carry the merchandise safely to its destination, excepting certain dangers of the sea, neither of which apply in the case at bar.

The charter party filed with the papers shows the vessel was chartered to carry cargoes (lumber) from Georgetown, S. C., to New York for the term of one year. Libelant was not a party to this contract. The cargo of cement was taken on the way to Georgetown on a bill of lading separate and distinct from the charter party, in which there is no stipulation or warranty of seaworthiness expressed, but "dangers of the seas, fire, and collision excepted," and the further expression, "not accountable for breakage, leakage, or rust." These stipulations do not, however, apply in the case at bar. Their meaning is well understood in admiralty, in cases where they apply. In the case at bar the damage was not, for instance, caused by the "dangers of the sea," unless it be that in shipping seas the water raised the covering of the hatches or run through the open seams and waterways of the upper deck, nor is there evidence the damage was caused by any other "leakage" than that from the upper deck. It is well known water will set and render useless cement. To store it where it will be virtually destroyed for all practical purposes, whether shipped by sea or land, is negligence for which the carrier is liable. The defect in the upper deck was patent,—visible to the naked eye. The charter party shows the shipowners recognized the fact the vessel was only seaworthy for carrying lumber. She had no rating with underwriters on account of her age and the failure to have her calked or overhauled within the customary period, and to receive a cargo on a ship in this condition is negligence for which no sophistry of reasoning or catch sentences in the bill of affreightment can exempt the carrier from liability in damages, when damages result therefrom.

For the reasons stated, a decree will be drawn and entered against the ship in favor of libelants for the amount claimed as damages. There is no force in the cross libel for damage, the ship being in the custody of the court at the time.