## THE PEHR UGLAND.

(District Court, E. D. Virginia. February 25, 1921.)

No. 2370.

1. **Shipping ⬦⟹102—Contract governed by law of place of performance.**
   A contract made in London for the carriage by a Danish ship of a cargo of coal from Norfolk, Va., to Buenos Aires, under which the cargo was loaded, bill of lading issued, and advance freight paid at Norfolk, and the voyage frustrated in the waters of the United States, *held* governed by the law of the United States.

2. **Shipping ⬦⟹152—Prepaid freight recoverable on frustration of voyage.**
   Under the law of the United States, in the absence of stipulation to the contrary, a shipper may recover prepaid freight money on failure to transport and deliver the cargo, regardless of the reasons therefor.

3. **Shipping ⬦⟹152—Vessel liable to charterer for prepaid freight.**
   A ship chartered to carry a cargo of coal from a United States to a South American port, which loaded the cargo, issued a bill of lading, and was paid the freight in advance, but which on proceeding to sea proved unseaworthy and abandoned the voyage, *held* liable to the charterer for the freight prepaid.

4. **Shipping ⬦⟹137—Obligation of owner to furnish seaworthy ship.**
   The Harter Act (Comp. St. § 8031) does not relieve a shipowner from his obligation to furnish a seaworthy vessel, nor can he avoid liability for failure to do so by the exercise merely of due diligence to perform his obligations in that respect.

5. **Shipping ⬦⟹125—Vessel liable for loss of cargo.**
   A ship loaded with coal at Norfolk did not proceed on her voyage until more than four months thereafter, when, a leak being discovered, she returned to port, when it was found that the coal was on fire, and it was unloaded with large loss. A part of the time her detention was due to a cause excepted in the charter, but this ceased to exist some six weeks before she sailed. *Held*, on the evidence, that the fire was not due to the condition of the coal when loaded, but to some cause occurring during the long delay, and that she was liable for loss of the cargo.

In Admiralty. Suit by the Buenos Aires Great Southern Railway Company, Limited, against the bark Pehr Ugland. Decree for libelant.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for libelant.

Herbert K. Stockton, of New York City, and Hughes, Little & Seawell, of Norfolk, Va., for respondent.

WADDILL, District Judge. This libel is brought to recover certain prepaid freight money and damages, for the failure of the re-

spondent to carry out its contract to transport a cargo of 2,054¼ tons of coal, delivered to it by the Berwind-White Coal-Mining Company in the port of Norfolk, Va., on or about the 27th day of September, 1917, to be carried to the libelant at Buenos Aires, pursuant to the terms of the bill of lading issued therefor at Norfolk, Va., by the master of the respondent. The freight money on said cargo amounting to $49,308, was advanced by the libelant to the bark and her owners, though not earned, and the said bill of lading and all rights of the Berwind-White Coal-Mining Company therein were assigned and negotiated to libelant, the present owner thereof, as well as of said advanced freight money. The bark, thus loaded, should have proceeded to sea immediately on her voyage—that is, within 48 hours—under the terms of the charter party, but failed and neglected to do so, and remained in the harbor of Norfolk because of alleged inability to secure from her home government permission to return to the United States, instead of to Denmark, as required by the latter government, until about the middle of December, 1917, a period of some 3 months, when she was still further delayed on account of the failure to secure the necessary supply license and a sufficient crew, losing some 15 days thereby, and until the 27th of December, when weather and ice conditions caused her to drag her anchor and go adrift, and to collide with another vessel at anchor in the harbor, resulting in very much loss of time, until the 29th day of January, 1918, and from the last-named date to the 4th of February because of inability to secure advances with which to pay bills, and from the 4th of February she was detained by wind and weather conditions until the 9th of February. On the last-named date she proceeded on her voyage, and when some 25 miles out of Cape Henry a leak was discovered in her forepeak, which caused her to return to Hampton Roads, arriving in Norfolk February 12th, when her cargo was found to be afire, and was not extinguished until February 18th. The cargo was ordered discharged from the vessel, which was completed on the 9th of March, and upon a survey of the same, made on March 20th, it was found to be unfit for reloading, and it was retained in the possession of and sold by the respondents. Libelant offered the owners of the ship to substitute a cargo to proceed to destination, which respondent refused to carry, except at an additional bonus of $25,000, and likewise refused to take the reconditioned cargo after the fire.

The libelant charges that the respondent was responsible for this entire loss of time, and particularly that the failure to carry the cargo safely was caused by the unseaworthiness of the vessel existing at the time of entering into the charter party, and during the entire period of the life thereof, above mentioned, and, moreover, that the damage to the cargo arose from the failure of the respondent to properly protect the same from spontaneous combustion, during the period that the same was on board, as aforesaid.

The respondent admits the receipt of the cargo, and payment of advance freight money, and the issuance of the bill of lading, as claimed by the libelant, but says that the Pehr Ugland was a Danish vessel,

subject to Danish laws, and to the control of the Danish government, and that that government prevented and restrained the bark from chartering herself, and proceeding on voyages, until the Danish government had approved the use of the vessel and given permission for her chartering; that in May, 1917, the Danish government, after application by the respondent therefor, granted permission for her charter for a voyage from North America to Buenos Aires and the River Plate, on condition that, after discharging her cargo at Buenos Aires, the vessel should take a cargo and transport it to Denmark. The vessel arrived at Norfolk and received her cargo, and when ready to sail on the 27th of September, 1917, her master applied at the custom house in Norfolk, Va., to obtain clearance papers, which were refused, unless her master guaranteed the return of the vessel from Buenos Aires to a United States port. Respondent promptly requested the Danish government for permission to give the guaranty required by the United States government, which was refused, and permission was not actually obtained until December 18, 1917, during all of which time respondent insists she was restrained and arrested at Norfolk and unable to proceed on her voyage; that she was again restrained and arrested from the 18th to the 27th of December, 1917, and clearance withheld for failure to procure license from the United States government to export her cargo; that meantime her crew had deserted, and on account of the weather she was fast in the ice, and was not ready to sail again until January 29, 1918; she was further delayed by wind and weather until February 9th, and she had only proceeded a distance of some 25 miles from the Capes when a leak in the forepeak was discovered; she returned to Hampton Roads on February 12th, when her cargo was found to be on fire, and after the fire was put out the cargo was removed from the vessel by order of the surveyors, and respondent claimed frustration of the voyage and the charter party at an end; that the frustration of the voyage was without any negligence or default on the part of the respondent, and was caused by spontaneous ignition of the cargo, one of the excepted perils of the charter of affreightment, viz. "fire"; and that the alleged unseaworthiness of the ship, assuming the same to have existed, in no manner affected or caused the conflagration, and virtual destruction of the cargo.

The more important facts in this case are not seriously disputed, namely, that the delay occurred after the cargo was taken on board, and between the ship's readiness for departure on the 27th of September, 1917, and the 9th of February, 1918; that the cargo was not unloaded and surveyed until the 20th of March, and the ship repaired until about a month later; that the cargo proved well-nigh a total loss, the same salving for some $18,000; that the freight money was paid in full, and the vessel proved to be unseaworthy.

Upon this statement of the case, certain legal questions arise as to upon whom the loss of the cargo should fall, and whether the prepaid freight money can be recovered, which involves likewise the determination of whether the charter party should be construed under English or American law; if under English law, whether prepaid

freight money can be recovered at all; and if under American law, if prepaid freight money can be recovered upon the mere frustration of the voyage. These will be considered in the order named.

[1] 1. In determining the law properly applicable, reference should be had to the character of the contract, the parties thereto, and where entered into. This contract was made in London, between an English corporation, the libelant here, and a Dutch corporation, owners of the Pehr Ugland, to charter the vessel to transport coal from Norfolk, Va., to Buenos Aires, and the causes resulting in this litigation took place after the contract was entered upon and partly performed at Norfolk. Recognizing fully that contracts are usually construed under the laws of the place where made, still there are exceptions to this rule, one of which is that the place where the contract is to be performed may be preferred. Here, after the signing of the contract in London, the same was completed by the acceptance of the cargo, issuance of the bill of lading, payment of freight money in large part, and the commencement of the voyage, and final frustration thereof, all in Norfolk, in the waters of the United States; and, manifestly, the construction of the contract is governed by the latter rule, with the result, in this instance, that the law of this country, and not that of Great Britain, should prevail.

In 12 Corpus Juris, p. 450, § 51, the doctrine exception is aptly stated as follows:

"Where the contract is to be performed at a place other than at which it is made, the parties, according to the general trend of American authorities, are presumed to adopt the law of the place of performance as the law of the contract"—citing in note 73 a long list of cases supporting the text, and including in the number Hall v. Cordell, 142 U. S. 116, 12 Sup. Ct. 154, 35 L. Ed. 956; Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; Andrews v. Pond, 13 Pet. 65, 10 L. Ed. 61.

In the last-named case, Mr. Chief Justice Taney, speaking for the Supreme Court, at page 78 of 13 Pet. (10 L. Ed. 61), said:

"The general principle in relation to contracts made in one place, to be executed in another, is well settled. They are to be governed by the law of the place of performance."

And in the more recent case of London Assurance v. Companhia de Moagens do Barreiro, 167 U. S. 149, 160, 17 Sup. Ct. 785, 789 (42 L. Ed. 113), Mr. Justice Peckham, citing Andrews v. Pond, 13 Pet. 65, 10 L. Ed. 61, supra, said:

"Generally speaking, the law of the place where the contract is to be performed is the law which governs as to its validity and interpretation. Story in his work on Conflict of Laws, § 280, says: 'But where the contract is, either expressly or tacitly, to be performed in any other place where the general rule is, in conformity to the presumed intention of the parties, that the contract, as to its validity, nature, obligation and interpretation, is to be governed by the law of the place of performance. This would seem to be a result of natural justice.'"

This same subject was considered by the Supreme Court in Liverpool & G. W. S. Co. v. Phenix Insurance Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, where Mr. Justice Gray, speaking for the court,

reviewed generally the authorities. In that case, the contract the subject of the litigation, was one partly to be, and was actually, performed at the place of its making, and hence the law of the place of the making of the contract, as well as of its performance in part, was held properly to control in the matter of its validity and interpretation.

2. It seems a concessuum in this case that, under the laws of Great Britain, prepaid freight cannot generally be recovered, certainly in cases where the damages arise as the result of a peril excepted in the charter party, though a different rule doubtless would prevail where it arises from the breach of the contract or charter party. This element becomes immaterial here, assuming the court is right, and that the English law does not control.

[2] 3. That the American law regarding the right to recover for prepaid freight is different from that prevailing in Great Britain, is well settled, and prepaid freight can be recovered in case of frustration of the voyage, and no right of recovery exists on the part of the ship against the cargo owner for such freight, when not paid. In the recent case of National Steam Nav. Co. v. International Paper Co., 241 Fed. 861, 154 C. C. A. 563, Judge Ward, speaking for the Circuit Court of Appeals for the Second Circuit, aptly stated the law on the subject (241 Fed. at page 862, 154 C. C. A. 564) as follows:

"The English cases on the subject of prepaid freight do not express the law of this country. Here prepaid freight, in the absence of an agreement to the contrary, must be returned to the shipper, if the goods do not arrive, and in such case the shipowner cannot recover it of the shipper, if not actually prepaid. For this we have the high authority of Chancellor Kent in Watson v. Duykinck, 3 Johns. (N. Y.) 335 (1808); Griggs v. Austin, 3 Pick. (Mass.) 20, 15 Am. Dec. 175 (1825); Pitman v. Hooper, Fed. Cas. No. 11,185 (1837); Phelps v. Williamson, 5 Sandf. (N. Y.) 578 (1852); Benner v. Insurance Co., 6 Allen (Mass.) 222 (1863); of the Supreme Court in The Kimball, 3 Wall. 37, 18 L. Ed. 50 (1865); and finally of our own decision in Burn Line, Ltd., v. Steamship Co., 162 Fed. 298, 89 C. C. A. 278. To the same effect is the law of the continent."

From a careful review of the authorities it will be found that under American law, in the absence of stipulation to the contrary, a shipper may recover prepaid freight money, from the mere failure to transport and deliver the cargo, regardless of the reasons therefor; whereas, under the English law, he cannot so recover, save in cases arising from breach of contract on the part of the shipowner.

[3] 4. This brings us to the consideration of the facts of the case, and the obligations and rights of the parties litigant, and incidentally, it may be said, that the right to recover for the prepaid freight money sued for, may depend upon and be controlled by different conditions from those affecting the loss of the cargo.

The contract between the parties, and under which their rights arise, was a charter party, a contract of affreightment, whereby the owners of the ship, on the one hand, undertook, for a named consideration, to transport a cargo of coal from a port in the United States, to a port in South America; the cargo owner agreeing to pay in advance for safe delivery of the same at its place of destination. The freight money was fully and promptly paid, and the cargo though promptly

placed on the ship, was neither transported nor delivered; but, on the contrary, the voyage was actually abandoned, and the ship, when subjected to the test and strain of the open sea, proved unseaworthy, and wholly unfit for the safe carriage of its cargo. That the ship was seaworthy, tight, staunch, and in every way fitted for the service undertaken, both as to structure and equipment, even as respects latent defects, was just what the shipowner contracted for, and specifically warranted, and every consideration looking to the proper, safe, and successful handling of the country's commerce by water, requires that this warranty shall be rigidly and strictly enforced. Hughes on Admiralty, §§ 73, 85; The Northern Belle, 76 U. S. (9 Wall.) 526, 19 L. Ed. 746; The Northern Belle v. Robson, 154 U. S. 571, 14 Sup. Ct. 1166, 19 L. Ed. 748; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; The Lockport (D. C.) 197 Fed. 213; Steel v. State Line Steamship Co., 3 Appeal Cases (L. R.) 72.

Had there been no specific warranty of seaworthiness, the law would have implied a warranty that the ship was seaworthy, and fitted for the service in hand, and for the faithful performance of which it contracted and accepted compensation. The Director (D. C.) 34 Fed. 57, 65; Pacific Coast v. Bancroft-Whitney Co., 94 Fed. 180, 36 C. C. A. 135; The Nellie Floyd (D. C.) 116 Fed. 80, affirmed 122 Fed. 617, 60 C. C. A. 175; The Dana (D. C.) 190 Fed. 650; Benner Line v. Pendleton. 217 Fed. 497, 133 C. C. A. 349.

[4] The provisions of the Harter Act (section 8031, Comp. Stat. 1916) cannot be relied upon to relieve the shipowner from the obligation to furnish a seaworthy vessel, or to escape from responsibility for failure so to do; and especially is this true when the unseaworthiness existed at the time the charter party was entered into. Nor can the owner escape liability by the exercise merely of due diligence to perform his obligations in this respect. His duty was to furnish a seaworthy vessel, and by frequent examinations and thorough inspection to see that it was so maintained, having regard to the service to be performed (The Northern Belle, 76 U. S. [9 Wall.] 526, 19 L. Ed. 746, and 154 U. S. 571, 14 Sup. Ct. 1166, 19 L. Ed. 748, supra); and this obligation becomes the more imperative where an old and not thoroughly strong and well-equipped vessel is in use (Wuppermann v. Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Aggi, 107 Fed. 300, 302, 46 C. C. A. 276; The Ninfa [D. C.] 156 Fed. 512; The Indrapura [D. C.] 178 Fed. 591, and 190 Fed. 711, 112 C. C. A. 351; Benner Line v. Pendleton, 217 Fed. 497, 133 C. C. A. 349; The Jeannie [D. C.] 225 Fed. 178). The evidence in the case is quite conclusive that the ship was in an unseaworthy condition, as well at the time of the breach of the contract as at the time of entering into the same, and during the entire life thereof, and that fact either was or should have been known to the vessel owner, also that this cause was the real, or at least a contributory and sufficient, cause for the failure to deliver the cargo in question, and hence that the right of recovery for the prepaid freight money is unquestioned, alike under the laws of the United States as under those of Great Britain.

[5] Considering the question of liability for loss of the cargo, different considerations arise from those properly controlling in respect to the right to recover prepaid freight money. Here the ship, in addition to the general denial of liability arising from loss of time between the 27th of September, 1917, when the cargo was loaded, and the 9th of February, 1918, when the ship actually put to sea, insists that, because of the restraint of princes clause and the loss from fire clause, she is not responsible for the delay, nor the loss by fire sustained, and says that the fire was caused by the combustible character of the coal loaded, for which the libelant was responsible, and that the unseaworthiness of the ship in no manner entered into the occurrence. The questions thus presented are not free from difficulty. If the combustible character of the coal caused the fire, and that was the only cause, there could be no recovery for the loss; and, of course, if, either under the restraint of princes clause and the loss from fire clause of the charter party, the evidence showed the vessel to be exempt, no recovery can be had for the loss of the coal. But the court does not think that the evidence warrants the relief from responsibility of the vessel, by reason of either one of the excepted or exempted clauses of the contract. Under the restraint of princes clause, much of the time lost after loading the ship and going to sea can be accounted for, but not all of the time, namely, from the 18th to the 27th of December, when she was detained, as claimed, because of the lack of a proper crew, and the failure to secure her supply license before clearance could be obtained.

The ship should have anticipated the necessity for a crew, and the supply license, pending the effort to secure permission from her government to return to the United States, and not have waited until actual authority was granted. The ship's master knew the permit was liable to arrive at any time, and had been fully advised by his own agent, 10 days before its arrival, of the issuance of the permit to sail, and having been detained for approximately 3 months with her cargo on board, he should at least have provided the necessary crew, without waiting, under the circumstances, to cause still further loss of time, with its possible serious consequences, as the result proved. Had the ship been ready to sail on the 17th of December, as she should have been, ample time would have intervened to enable her to make her destination before the breaking out of the fire from the alleged cause of combustion, assuming, of course, the ship to be seaworthy. Moreover, the court does not think that the testimony warrants the conclusion that the fire resulted from the combustible character of the cargo. Had this condition been true, it is hard to believe that the fire would not have developed earlier, between the 27th of September and the 12th of February, when the vessel was subjected to all sorts of weather conditions, including September's heat, and the long freeze during the month of January, and when she was, much of the time, drifting about, with the ice conditions that then prevailed, and herself in collision with another vessel during the same period.

It seems to the court, under all the circumstances, that fire in the cargo would more likely have resulted from lack of proper care

on the part of those handling the ship, during its long and eventful stay, in and around Norfolk, to see especially that the cargo was afforded proper ventilation, and safeguarded from weather conditions that would have caused it to become wet and heated. Liverpool Steam Co. v. Phœnix Ins. Co., 129 U. S. 397, third paragraph of syllabus, 9 Sup. Ct. 469, 32 L. Ed. 788. In this same connection, sight cannot be lost of the fact that certain presumptions unfavorable to the vessel owner necessarily arise from the use of a confessedly unseaworthy vessel. The cargo was delivered in admittedly good condition, and a proper bill of lading so certifying, issued therefor, and with the cargo thus exclusively placed in the ship's control, and the fire arising without apparent cause, the vessel should at least show that her unseaworthy condition did not, and could not, have entered into the cause of fire; and especially is this true if it is sought to escape liability by bringing the case within one of the excepted clauses of the charter party. The Queen (D. C.) 78 Fed. 155; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 Fed. 180, 36 C. C. A. 135, supra; The Lockport (D. C.) 197 Fed. 213; The Jeannie (D. C.) 225 Fed. 178, supra.

What has been said makes it unnecessary for the court to consider the various causes of delay set forth in the proceedings in detail, and whether the respondent was exempt from liability under the restraint of princes clause of the charter party, for loss of time to December 27, 1917, and under other restrictive provisions, from portions of the time thereafter occurring, before starting upon the voyage.

The court's conclusion upon the whole case is that the libelant is entitled to recover for the freight money paid by it, together with the amount paid for the coal, less the net amount realized from its sale, when discharged from the vessel and a decree carrying out these findings will be entered on presentation.