clusive, unless it is arbitrary and without any foundation in justice and reason.' Nor can the courts review merely on general allegations that the assessments are 'arbitrary, excessive, and confiscatory.' Facts must be pleaded which show that the decision of the lawmakers was not merely erroneous, but that it was manifestly outside of the range of the facts, so as to amount to an arbitrary abuse of power; for nothing short of that will authorize a review by the courts."

In Salmon v. Board of Directors, 100 Ark. 366, at page 369, 140 S. W. 585, at page 586, the court said:

"Again, it is alleged in the answer, and it is now insisted, that the benefits to the land in question to be derived from the improvement will not be commensurate with the amount of assessments levied, and that the annual assessment should not have exceeded 4 per cent. of the valuation of the lands, which amount appellant tendered in court. The legislative branch of the government is, as we have said in several cases, the sole judge in the matter of creating improvement districts of this character, in establishing the boundaries thereof, and in determining, or in providing means for determining, the amount of assessments based on benefits, and the courts will not interfere unless an arbitrary and manifest abuse of the power is shown. Mere mistakes of the lawmakers, or of those empowered by the lawmakers to make assessments, in fixing the amount or rate of assessment, will not be reviewed and corrected by the courts. Moore v. Board of Directors Long Prairie Levee District, 98 Ark. 113, 135 S. W. 819; Board of Improvement v. Pollard, 98 Ark. 543, 136 S. W. 957."

The decree of the court below is affirmed.

---

## THE CHARLTON HALL.

(Circuit Court of Appeals, Second Circuit. June 14, 1913.)

No. 253.

Shipping (§ 141*)—Damage to Cargo—Perils of the Sea.

Damage to a cargo of nitrate from water escaping from a steel ballast tank which was being filled while the vessel was discharging, caused by the fact that the top of the tank had buckled so that the manhole cover did not fit, *held* due to perils of the sea for which the vessel was not liable under the exception in the bill of lading; there being evidence that the tank was properly constructed and was in good condition when the vessel started on her return voyage from western South American ports to Philadelphia, and that she encountered very severe weather which injured her in other respects.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497–499; Dec. Dig. § 141.*

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the E. I. Du Pont de Nemours Powder Company against the steamship Charlton Hall, J. Robertson Dunn, claimant. Decree for respondent, and libelant appeals. Affirmed.

Following is the opinion of the District Court, by Hough, District Judge:

In January, 1912, the Charlton Hall arrived at Philadelphia with a cargo of nitrate from the West Coast of South America. After discharging a part of her cargo the officers of the ship deemed it advisable to fill up the No. 1 ballast tank. The sea cock was opened and more than enough time elapsed to fill up the tank, yet soundings showed that the tank was not full, while sounding the bilges revealed no water in them. This condition of affairs apparently puzzled those in charge of the steamer, but they finally shut off the sea cock and (continuing the discharge of cargo) found that so much water had come into the hold (or remained in the hold) during the extremely cold weather then prevailing that the cargo was frozen stiff for some two or three feet above the ceiling of the hold. This ceiling is a permanent board covering extending over the top of the tank and forming the floor upon which the cargo is laid. Access to the tank is gained by hatches in the ceiling. There is no evidence that at any time this ceiling was injured or broken or in any such condition that pressure or a blow could have been given by cargo to the tank. The ceiling at all times fulfilled the function for which it was devised.

The cause of the frozen water in the cargo remained a mystery until the Charlton Hall had gone (light) from Philadelphia to New York, where she was drydocked, and it was then discovered that the cement on her port side between 14 frames was cracked and broken, much of it badly, and that one of the manhole covers, also on the port side, was displaced in a very curious manner. As constructed, this manhole cover consisted of a steel or iron plate over the manhole, packed with a gasket and tightened with a dog by means of a central screw bolt. This is a usual and proper method of construction. On survey the screw, dog, manhole cover, and gasket were all perfect, but the top of the tank had become deformed or buckled in such a manner that a good gasket and duly tightened dog no longer made a watertight joint. When the tank was filled the water spurted out in a considerable stream.

This case differs from many others of the kind in the fact that this examination, made shortly after damage discovered and before the ship was laden, revealed exactly what was the matter, for there is no contradiction of the evidence showing that the amount of water which would flow through the sea cock during the time the same was opened, and which would escape through the deformed manhole joint, was quite enough to account for all the frozen water which injured the cargo.

It may be noted here that the rapid freezing of the water is measurably accounted for not only by the severity of the weather but the fact (of which judicial notice is taken) that the sea cocks were opened at Philadelphia in fresh water, something which greatly facilitated freezing; and this accounts for the fact that the water did not show in the bilges, which were also frozen.

The leading question of fact is how and when did that deformation of the tank top occur, which (proximately if not legally) caused the injurious flow of water? Claimants contend that it arose from peril of the sea on the long and stormy passage from Antofagasta to Philadelphia. Libelant points out that no other substantial injury to the ship was discovered, that the weather, while severe, was not materially different from that encountered on the outward passage, and therefore asserts that there was a defect in the ship at the beginning of the voyage amounting to a lack of seaworthiness, concluding that, since the vessel was not seaworthy when the voyage from Antofagasta began, the saving exception in the bill of lading concerning peril of the sea does not apply, and neither does the protection of the Harter act.

The Charlton Hall had been surveyed for reclassification immediately before starting from New York for the West Coast of South America; she received the highest classification; and the evidence is direct that this particular tank was then tested and found tight. She arrived at her first port of destination with tanks empty, and she did have heavy weather going out. As cargo went out, ballast tanks were filled, and the No. 1 tank was filled

from Valparaiso to Callao, and then down to Iquique, or, in time, from October 10th to November 7, 1911.

The first cargo for the United States was taken on (as per bill of lading) at Caleta Buena on November 4th, and next at Iquique on November 8th. Down to this time the No. 1 tank was full. Waves are high on the Pacific Ocean, and at these nitrate ports the steamer lay off the coast in surf of such a character that the lighters bringing out the cargo lost, and apparently were expected to lose (judging by the provisions of the charter party), considerable parts of their loads.

When at Caleta Buena the inward cargo began to come on board the captain personally went into the hold, saw that it was all in order and the bilges dry; the tank was then full. Having taken on board upwards of 19,000 bags of nitrate, he went to Iquique with the tank still full, and there, having taken on more than 31,000 bags, pumped out the tank. Certainly no freezing rendered detection of leakage difficult at that time and place, yet the bilges remained dry. This is satisfactory evidence to me that the manhole cover was in good condition at and after leaving Caleta Buena, at which point the inward voyage began.

Libelant has introduced expert evidence to show that the buckling of the tank top could not have occurred by the tossing and twisting of the ship in heavy weather without other and more substantial injury being shown to the fabric of the vessel than is indicated by the breaking and cracking of cement between frames. These opinions are most respectable, but since the weather admittedly was very heavy and the cement was broken, they do not answer the inquiry, Why did the tank top buckle? That the metal was sufficient and of good quality is, I think, shown by the action of Lloyd's surveyor when the difficulty was discovered, for he did not require a plate to be substituted nor the metal even to be faired in place, but put on a different kind of manhole cover which could be made tight notwithstanding the inequality or buckling of the tank top.

In my opinion the evidence affirmatively shows that a proper manhole cover closing an aperture in a well-built tank did begin leaking by the overpowering action of the wind and waves on the voyage from Caleta Buena to Philadelphia; the vessel having been seaworthy in respect of this tank on leaving the port of departure. It follows that the damage complained of is within the exception of the bill of lading, and the libel is dismissed, with costs.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellant.

Burlingham, Montgomery & Beecher, of New York City (Robinson Leech, of New York City, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. Decree affirmed, with costs, by a majority of the court, on opinion below.

WARD, Circuit Judge, dissents.