## BENNER LINE v. PENDLETON et al.

### (Circuit Court of Appeals, Second Circuit. August 10, 1914.)

### No. 283.

**1.** SHIPPING (§ 53*) — CHARTER — LOSS OF CARGO — SUIT BY CHARTERER AS BAILEE AGAINST OWNER.

Where the charterer of a vessel held itself out to the public as a common carrier, advertised for and solicited cargoes, fixed the freight rates, received and discharged the cargoes, and provided its own bills of lading in its own name, although they were signed by the master as customary, the charterer, and not the owner, was the bailee of the cargoes, and as such bailee entitled to maintain a suit in its own name against the shipowner for loss of a cargo through the unseaworthiness of the vessel.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 214-218, 225; Dec. Dig. § 53.*]

**2.** SHIPPING (§ 121*)—CARRIAGE OF GOODS—WARRANTY OF SEAWORTHINESS OF VESSEL.

A shipowner either expressly or impliedly warrants his ship to be seaworthy and fit for the cargo and particular service for which she is engaged at the commencement of the voyage, and such warranty is an absolute undertaking, and covers latent defects not ordinarily susceptible of detection, as well as those which are discernible by inspection.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449-451, 466; Dec. Dig. § 121.*

Implied warranty of seaworthiness, see notes to The Carib 'Prince, 15 C. C. A. 388; Neilson v. Coal Cement & Supply Co., 60 C. C. A. 179.]

**3.** SHIPPING (§ 132*)—LOSS OF CARGO—UNSEAWORTHINESS OF VESSEL.

The loss of cargo by the sinking of a schooner on a voyage from New York to Porto Rico *held*, on the evidence, due to the unseaworthiness of the vessel at the commencement of the voyage, where, although she was examined and pronounced seaworthy by experts before sailing, she began to leak seriously when only three days out, without having encountered any unusually bad weather, and her pumps proved to be so badly out of repair as to be practically useless.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471-487; Dec. Dig. § 132.*]

**4.** SHIPPING (§ 137*)—LIABILITY FOR LOSS OF CARGO—HARTER ACT.

Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1913, § 8031), which exempts a shipowner from liability for loss of cargo in certain specified cases, does not relieve him from the duty of furnishing a seaworthy vessel at the beginning of the voyage, nor affect his liability for loss of the cargo arising from unseaworthiness.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 137.*

Statutory exemptions of shipowner from liability, see notes to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11; Raeli v. New York & T. S. S. Co., 83 C. C. A. 294.]

**5.** SHIPPING (§ 137*) — LIMITATION OF LIABILITY — PERSONAL CONTRACTS OF SHIPOWNER.

A charter party, warranting the vessel to be seaworthy and in every way fitted for the voyage, signed by a firm as agents for the particular vessel, of which one of the partners was managing owner, was his personal contract, and he cannot limit his liability for loss of the cargo through the unseaworthiness of the vessel, under Rev. St. § 4283 (U. S. Comp. St. 1913, § 8021), or Act June 26, 1884, c. 121, § 18, 23 Stat. 57 (U. S. Comp. St. 1913, § 8028), which apply only to risks arising from

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**217 F.—32**

the conduct of, or contracts made by, others than the owner, and imputed to him from the necessities of commerce.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 137.*]

6. CONTRACTS (§ 1*)—"PERSONAL CONTRACT."

A "personal contract" is a contract made by the person or corporation to be bound, as distinguished from one imputed to such person or corporation.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, Personal Contract.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here on appeal from a final decree of the United States District Court for the Southern District of New York finding that the libelant is entitled to recover from the respondent Fields S. Pendleton nine-sixteenths of the amount of its damages, but that the said Fields S. Pendleton is entitled to limit his liability to his interest in the schooner Edith Olcott and her freight, and dismissing the libel as to the said Pendleton, which decree was entered on November 29, 1913.

The libelant is a corporation organized under the laws of the state of New Jersey and engaged in business as a carrier between the port of New York and ports in Porto Rico. The respondents are copartners engaged in business as ship brokers in the city of New York, borough of Manhattan, state of New York. They were the managing owners of the schooner Edith Olcott; the respondent Fields S. Pendleton owning in his own right nine-sixteenths of the vessel.

On July 7, 1910, the respondents chartered the vessel to the libelant for a voyage from New York to San Juan, Porto Rico. On August 6th the King Edgar, seeing the Olcott's signals of distress, came alongside and took the vessel in tow when in latitude 37.3 degrees N., longitude 65.3 degrees W., under an agreement to tow her to New York for $15,000. But on August 7th the tow rope parted and the vessel was abandoned, at 6 a. m., in a sinking condition; the water in her hold having then reached a depth of 13½ feet and gaining steadily despite all efforts to prevent it.

The charter party was signed in the name of Pendleton Bros., and the suit was brought against Pendleton Bros. and against Fields S. Pendleton individually. It having developed at the trial, however, that neither the firm of Pendleton Bros. nor the respondent Edwin S. Pendleton owned any share in the vessel or had any interest in the transaction except as agents, it was conceded by the libelant at the close of the trial, that recovery could be had only against the respondent Fields S. Pendleton, who was the managing owner of the vessel, and who hereafter will be referred to as the respondent.

For opinion below, see 210 Fed. 67.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellant.

Henry W. Goodrich, of New York City, for appellee.

Before COXE and ROGERS, Circuit Judges, and HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). This libel is filed by the libelant as bailee of a cargo of general merchan-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

dise laden on board the schooner Edith Olcott, which was lost at sea with her entire cargo on August 7, 1910. The value of the cargo amounted to $40,000, and to recover this sum the suit is brought. The theory of the suit is that the respondent failed to furnish a seaworthy vessel at the beginning of the voyage. The respondent denied the allegations as to the unseaworthiness of the schooner and alleged that due diligence was exercised to make the vessel in all respects seaworthy and properly manned, equipped, and supplied. And further answering the respondent stated that if it in any way appeared that the vessel was not seaworthy at the commencement of the voyage or thereafter that such unseaworthiness was without his privity or knowledge, and under the laws of the United States relating to limitation of liability on the part of vessel owners he is relieved of all liability growing out of the loss of said schooner, "and if any liability on the part of this respondent does exist, it is limited to his proportionate part of said schooner as hereinbefore stated."

[1] It was urged in the argument that libelant has no capacity to sue as a bailee for the loss of the goods. The contention was that the shipowner was the bailee of the cargo and not the libelant. The libelant held itself out to the public as a common carrier; it advertised for and solicited cargoes; it provided a dock to which the cargo was delivered; it chartered the vessel by which the cargo was to be carried, and employed the stevedores who put the cargo on board the ship; it fixed the freight rates and received the freight upon the shipments; and it provided its own form of bill of lading, which was in its own name, and not in the name of the ship, or in the name of the respondent, and it was signed at its office by the master or agents of the vessel. There is nothing out of the ordinary in that it was signed by the master of the vessel, that being the usual practice. No goods could be put on board the vessel except by virtue of a prior contract of affreightment with the libelant. The shippers knew only the Benner Line and contracted with the Benner Line, which took all the profits of the enterprise. The shippers or owners of the merchandise took no part in the selection of the ship by which the goods were carried. It is impossible to say under the circumstances of the case that the ship rather than the libelant was the carrier and that the libelant is without right to sue as bailee of the cargo. If the libelant was the carrier, and of that we have no doubt, then there can be no question but that the action can be maintained. In The Beaconsfield, 158 U. S. 303, 307, 15 Sup. Ct. 860, 861, 39 L. Ed. 993 (1895), the Supreme Court, speaking through Mr. Justice Brown said:

"It is perfectly well settled that the carrier is so far the representative of the owner that he may sue in his own name, either at common law or in admiralty, for a trespass upon or injury to the property carried."

And see The New York (D. C.) 93 Fed. 495 (1899). In that case the charterer used the barge for the transportation of goods for third persons between New York and New London. The cargo was injured by water which reached it by leaking through the upper seams of the vessel. The court held that the charterer as carrier was so far the

representative of the owner of the cargo that he was entitled to sue in his own name for the injury done the cargo.

Of course no question can be raised as to the right of a bailee to maintain any proper action to recover for a breach of contract in connection with the bailed property during the existence of the bailment.

[2] There can be no question but that it is the duty of the shipowner to provide a ship which is fit and competent for the cargo and particular service for which she is engaged. The carrier either expressly or impliedly warrants the seaworthiness of the vessel at the commencement of the voyage. The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. And this warranty that the vessel is fit at the beginning of the voyage is an absolute undertaking, which is not dependent on the owner's knowledge or ignorance that the ship is in fit condition to undergo the perils of the sea. The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644. The warranty covers latent defects, not ordinarily susceptible of detection, as well as those which are known or discoverable by inspection. In The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 825, 38 L. Ed. 688 (1894), the Supreme Court adopted the language used by Mr. Justice Gray in the Circuit Court in which he said:

"In every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy. * * * The warranty is absolute that the ship is, or shall be, in fact seaworthy at that time, and does not depend on his knowledge or ignorance, his care or negligence."

And in The Caledonia, 157 U. S. 124, 130, 15 Sup. Ct. 537, 540, 39 L. Ed. 644 (1895), the above doctrine is reaffirmed and Mr. Chief Justice Fuller said:

"The proposition that the warranty of seaworthiness exists by implication in all contracts for sea carriage, we do not understand to be denied; but it is insisted that the warranty is not absolute, and does not cover latent defects not ordinarily susceptible of detection. If this were so, the obligation resting on the shipowner would be, not that the ship should be fit, but that he had honestly done his best to make her so. We cannot concur in this view. In our opinion the shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage; and, this being so, that undertaking is not discharged because the want of fitness is the result of latent defects."

It may be conceded in the case at bar that the respondent thought that the Edith Olcott was in a seaworthy condition at the time she started on her voyage to Porto Rico. The respondent, before the vessel started on her voyage, instructed the most competent captain in his employ to put the boat in dry dock and have her put in seaworthy condition to go in the Gulf of Mexico to stay for 8 or 10 months. The man had been employed by the respondent's concern for more than 40 years, and the matter was turned over to him because, as respondent testified, there was no man in the country in his opinion who was more competent. "He is the only master," he testified, "that never cost us a dollar; he is the only man I know of that has had that success." That this man was a thoroughly competent man seems to be

admitted. But neither the good intentions of the respondent nor the competency of this captain can save the respondent from liability if notwithstanding what was done the vessel was not in reality in a seaworthy condition when this voyage was commenced.

To constitute seaworthiness the hull must be so tight, staunch, and strong as to be competent to resist all ordinary action of the sea and to prosecute and complete the voyage without damage to the cargo.

[3] The Edith Olcott was a four-masted wooden schooner of some 985 tons burden. She was 192.4 feet in length, 42.4 feet in breadth, and 18.4 feet in depth below the main deck. She was about 20 years old, having been built in 1890. The vessel was considered in insurance circles as good a risk as the usual vessel of her age. One of the experts who examined her before she started on this voyage reported that she was in "the pink of condition." Witnesses who inspected her testified that they found her seams and butts in first-class order, as were her rigging, decks, waterways, and chain plates, and that she was "in first-class condition," "one of the finest vessels" the witness had ever seen, and "fit to go around Cape Horn in."

The superintendent of the Dry Dock Company testified as to repairs made on the vessel in July and December, 1909, and in January and July, 1910. It appears that she was on the dock in July, 1910, and an an examination was made of her bottom and seams. The witness was asked whether at that time she was tight, staunch, and strong, and he answered, "I should say she was," but admitted he was testifying from a more or less general impression. The inspector of the American Bureau of Shipping, whose business it was to inspect vessels for the purpose of underwriting, testified that the vessel was "first-class," and that she was thoroughly examined for reclassification in 1905 and was given an A-1 rating for six years—a rating which would have expired in June, 1911, one year after the loss of the vessel occurred. He stated that the Edith Olcott was "exceptionally well built, exceptionally well cared for, and an exceptionally good vessel at the time she was lost," and that she was incapable of receiving any higher classification than was given her in his bureau. The evidence given by other inspectors was of similar import.

Now we pass to inquire what happened. She left New York for Porto Rico on Sunday, July 31, 1910. All went well until Wednesday, when it was discovered she had about 4 feet of water in the hold. The amount of water gradually increased until Saturday, when it had increased to 13 feet and she had to be abandoned with her cargo and became a total loss.

By way of explanation of the cause of the leak, the suggestion has been made that the vessel must have struck some submerged object on the night between August 2d and 3d. No suggestion to this effect was made until nearly three years after the disaster. The engineer of the Olcott testified that he felt some sort of a slight shock about 12 o'clock on Tuesday night, August 2d; that he did not think anything had happened, and that he turned in to bed; that he never mentioned it to any one, except that when the mate came around he said to him, "What struck her?" and got the reply, "Nothing as I know

of." It could not have been much of a shock, for neither the captain, nor mate, nor any one else on the vessel noticed it. No mention of any shock is found in the protest drawn up in the respondent's office and verified by the officers and crew of the Edith Olcott, and the answer contains no allusion to it.

When the testimony was taken a witness of wide experience at sea was asked whether in his opinion it was possible that a vessel could hit an obstruction with force enough to damage her, assuming that she is a seaworthy vessel, and cause her to leak, without its being noticed by persons on board who were awake. He answered that it was not. This testimony seems to us most credible. It is true that one of the respondent's witnesses, also a man of experience and character, testified that he thought the vessel must have struck a submerged wreck or something of that kind. He stated he had been on a vessel which struck a concealed obstruction which caused the vessel to leak, and that he had no knowledge at the time that the ship had struck it. But in that case the fact that the vessel had struck the obstruction was not discovered until the vessel had arrived at her destination and been discharged of her cargo. It is quite credible that a vessel might strike an obstruction and cause a slight leak without attracting attention at the time. But it is difficult to believe that a staunch and seaworthy vessel could meet with an obstruction serious enough to send her to the bottom without its being noticed by those whose business it is to keep watch over all that happens.

There is, too, another reason for thinking that the trouble was not occasioned by an obstruction striking the bottom of the ship. In this case the schooner started to leak, and when the weather got worse the leak got worse, and when the weather got better the leak also got better. A collision striking a vessel below the water line would not produce results of that kind. On the contrary, a leak so produced would be continuous, or else grow worse all the time. The account the witnesses give of this leak is the story of a vessel whose seams have opened, and not of one having a hole opened in her bottom. The protest filed on August 10th stated that on August 3d the leak was discovered, and:

"After working pumps one hour, sounded again, and found leak increasing. Latter part, wind and sea still increasing in force."

And on August 4th:

"8 A. M. Wind and sea the same. Vessel laboring and straining and shipping considerable water. Leak still beyond control of the pumps. Sounded pumps, and found eight feet of water in hold. Steam pumps kept going continually. Noon. Wind and sea moderating somewhat. Steam pumps holding water in control at eight feet for the remainder of this day."

And on August 5th:

"Wind and sea more moderate. Running before the wind and sea. Sounding pumps every hour, finding water still at eight feet. Steam pumps continually working. 8 P. M. Heavy squall from southwest, causing sea to rise rapidly. Vessel laboring heavily and shipping immense quantities of water. Leak increasing on pumps."

And on August 6th:

"10 P. M. Vessel plunging into head sea, shipping large quantities of water, and settling forward. Steam pumps going constantly. Sounded, and found water gaining. Midnight. Wind and sea still increasing. Sounded, and found ten feet of water in vessel. Vessel would not answer helm, was continually under water, and settling. Engine room and cabin flooded."

And on August 7th the weather was "serious" and the amount of water was "thirteen and one-half feet," and the vessel was abandoned. While it may be possible that this vessel struck a submerged object without the knowledge of those on board, and that such a collision occasioned a loss, we think the possibility of such an occurrence is too remote to be made the basis of a judicial finding. The vessel had been on a voyage from Baltimore to Jacksonville, Fla., with a cargo of railroad iron, which is considered one of the hardest, if not the hardest, cargo than can be put into a vessel. She brought back a cargo of yellow pine ties. The voyage on which she carried the railroad iron was the last preceding the one on which she was lost. It was not unlikely that that voyage seriously weakened her and strained her seams, so that the heavy weather she encountered caused the seams to open and the ship to leak. While the weather was heavy, there was nothing so extraordinary about it that a ship in a seaworthy condition should not have been able to stand the strain. The fact that the vessel sprang so bad a leak, and that no satisfactory explanation of the fact has been made, indicates to us, as it did to the court below, that the vessel was not seaworthy as to her hull at the beginning of the voyage.

This brings us to a consideration of the vessel's pumping equipment. The testimony shows that she was provided with more pumps than most vessels. There were two large steam pumps and two hand pumps. One of the steam pumps—a six or seven inch wrecking pump—was in the engine room in the well deck forward, and was operated by a cogwheel on the shaft of the winch. The other steam pump, known as the "messenger pump," was situated on the main deck aft of the engine room, and was operated by a messenger chain, which ran from the shaft of the winch out through the side of the engine room. The messenger pump was a double pump, and had a capacity about equal to that of the wrecking pump. There was a fifth pump, but it was not designed for taking water out of the hold. It was a small circulating pump designed for running water through the condenser and for washing down decks, and is not to be regarded as part of the vessel's regular equipment for pumping water out of the ship. It is undisputed that within an hour after the wrecking pump was started some of the cogs were stripped from the wheel, rendering it thereafter impossible to make use of it. The port hand pump was tried, but with a result so unsatisfactory that it was decided to try the starboard hand pump. But after using it an hour and a half the men were unable to move it. Orders were given to hoist it out, and after this was done it was lashed down on the deck and never used again; the reason assigned for so doing being that it had been bent while being hauled out. Then the port hand pump was used again for something over an hour, when it had to be abandoned, and no effort was made again to use either of the

hand pumps. There was testimony tending to show that when the starboard hand pump was hauled out the suction pipe was found to have been rusted through. While the messenger pump was used, the testimony shows it did not work at anything like its full capacity. It was evidently in poor condition; one witness stating that, when he observed it, it was discharging "a mere dribble of water." The statement of some of the witnesses was to the effect that, had even one pump, either hand or steam, been in an efficient condition, the schooner could have made port without any assistance whatever.

There was testimony to show that the pumps were in good order before the vessel sailed. But over against this testimony stands the fact that three of these pumps broke down one after the other when an attempt was made to use them for the very purpose for which they were provided, and that the fourth pump did not respond effectually when it was put into operation. The court below thought the inference was irresistible that the pumps which failed were not fit to use when the ship began its voyage. That inference seems justified, and, if justified, the conclusion is unavoidable that the ship was not seaworthy in this respect, also, when she started on the voyage. One of the witnesses, a seaman on the King Edgar, which took the Olcott in tow, testified that he made an examination of the pumps and found them "in a rusty condition; the pipes were corroded, and if you put your hand against them they were liable to fall away and break." That refers to the hand pumps. The steam pumps "were in a condition that they would not suck; one which was working was in a bad condition, owing to the gipsy chain having no connecting links, and it was in a very poor state; it would not have lasted if we had tried to tow her back to New York." He also said:

"I saw one pump working; the others would not work at all, owing to the pipes having holes in them. They would not suck. The pumps had been out of condition, for a good time, a very long time, I should say; they were corroded with rust."

Much of the testimony concerning the condition of the pumps is unworthy of credence, as coming from persons characterized very properly by the court below as "obviously a venal and dishonest lot," who offered their testimony against the respondent after they had offered their testimony in his favor for money and been refused. But it may be said of the pumps, irrespective of all such testimony, res ipsa loquitur—the thing speaks for itself. The pumps were not in condition to be used. Three of the pumps broke down, as soon as the emergency arose when they were needed, and there is no satisfactory explanation forthcoming telling why they broke down. We are forced to the conclusion, therefore, that as respects both her hull and her pumps the vessel was not seaworthy when she began her voyage.

[4] This being the case, the question arises whether the respondent, being liable upon the principles of the maritime law, can claim the benefit of the Harter Act. The Congress of the United States has passed from time to time various statutes limiting in greater or less degree the absolute liability of carriers by water. The most important of all these statutes is the act of February 13, 1893 (27 U. S. St. at L. 445,

c. 105, U. S. Comp. St. 1901, p. 2946), which is known as the Harter Act. That act in section 3 provides as follows:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

This act has no application to the facts of this case. The Edith Olcott was not lost because of any fault in navigation or from dangers of the sea within the meaning of that expression in maritime law. There is no evidence tending to show any negligence, fault, or error on the part of the ship's officers or crew after the voyage began. The fault was not a "fault or error in navigation or management of the vessel."

The Harter Act in the section cited above does not relieve the owner from the duty of furnishing a seaworthy vessel at the beginning of the voyage, or affect his liability for the loss of the cargo arising from unseaworthiness. The trend of judicial decision has been to construe the Harter Act strictly. The law on this subject has been correctly stated as follows:

"The greatest amount of litigation under the act has centered around the third section. This section does not release the owner from the duty of furnishing a seaworthy vessel at the beginning of the voyage or affect his liability for damages to the cargo arising from unseaworthiness, but only exempts him from liability for damage arising from the risks therein designated when due diligence has been used to make the vessel seaworthy." 36 Cyc. 282.

[5] Congress has also passed acts limiting a shipowner's liability to the value of the vessel and the freight earned. The most important of these statutes was passed March 3, 1851, and which has been amended from time to time; the most important of the amendments being those of June 26, 1884, and June 19, 1886. The act of Congress provides for limiting the liability of the owner of the vessel for the loss of goods shipped, so that it shall not exceed the amount or value of the interest of such owner in such vessel and her freight then pending. Revised Statutes (2d Ed.) 1878, § 4283; 23 U. S. St. at L. 57, c. 121, § 18 (U. S. Comp. St. 1901, p. 2945); 24 U. S. St. at L. 80, c. 421, § 4 (U. S. Comp. St. 1901, p. 2945).

The act of March, 1851, enacted:

"That liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing lost, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

And the act of June 26, 1884, enacted that:

"The individual liability of a shipowner, shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessels and freight pending: Provided, that this provision shall not affect the liability of any owner incurred previous to the passage of this act, nor prevent any claimant from joining all the owners in one action; nor shall the same apply to wages due to persons employed by said shipowners."

The two acts have been regarded as being in pari materia and therefore have been construed as parts of one entire scheme.

The respondent insists that, if he is liable for the loss of the cargo on the Edith Olcott, he is entitled to limit his liability under this legislation; the loss having been incurred without his "privity or knowledge." But the libelant claims that the respondent cannot have the benefit of the act as it was not intended to apply to personal contracts.

This court decided in The Loyal, 204 Fed. 930, 123 C. C. A. 252 (1913), that a shipowner is not entitled to a limitation of liability for a breach of his personal contract. We held in that case that where a lighterage company contracted to do all the lighterage for an importer for a fixed term, which contract carried by implication a warranty that the lighters furnished should be seaworthy but because of the unseaworthiness of one salvage services were incurred to save the cargo, the company was not entitled to limit its liability for such expense. In announcing the principle we did in the above case we followed the decision made by the Sixth Circuit in Great Lakes Towing Co. v. Mill Transfer Co., 155 Fed. 11, 16, 83 C. C. A. 607, 612, 22 L. R. A. (N. S.) 769 (1907). In that case the court said:

"The purpose of Congress was, as we think, to relieve the shipowner from the consequences of those extraordinary risks which were imposed without limitation by the law of the admiralty as that law had been interpreted in this country. And by extraordinary risks we mean those risks arising from the conduct of, and contracts made by, those who are beyond the personal supervision and control of the owner and yet have legal authority to bind him to answer for their conduct or contracts; or, to express the thought in another way, that the liabilities intended by this legislation were those peculiar to him as a shipowner and had been imputed to him because of his relation to the ship, and not those liabilities, whether for torts or from contracts, which spring from his own personal conduct or stipulation. It seems to us altogether unlikely that Congress intended to qualify the power of an owner to make contracts in relation to his ship which by the universal law would be valid if made about anything else and would be enforced in the courts in common-law actions. It would be an anomaly that a party competent to do business should be unable to make a valid contract about his own affairs or be given such an immunity as to make his stipulations of uncertain value."

The question therefore arises whether the contract of the respondent is a personal contract. The court below thought that it was not. The District Judge said:

"The charter party signed by Pendleton Bros. was a charter party of the particular schooner Edith Olcott. Pendleton Bros., in signing that charter party, acted as the agents of the owners. The agreement was the owners' agreement chartering the schooner, and was an agreement made in the conduct of the schooner. Under such circumstances, in my opinion, the charter

party cannot be regarded as the mere personal contract of Pendleton Bros. It was the ordinary case of a charter party binding the vessel."

The learned District Judge thought the case at bar distinguishable from the case of The Loyal and from the Great Lakes Towing Co Case, in that in those cases the contracts did not specify any particular vessel, by which in the one case the lightering was to be done and in the other by which the towing was to be done. We find no such distinction laid down in any of the authorities. It seems to us that the distinction which the courts have drawn relates to the manner in which the contract is made, rather than to the character of the contract itself. The rule which has been established is that the shipowner may limit his liability as to contracts or obligations entered into by others on his behalf, or imputed to him by law; but he may not limit his liability upon contracts which he personally makes or upon obligations which he personally assumes. If the particular contract is made by the shipowner in person, it is a matter of no consequence, so far as the question now under consideration is concerned, whether it relates to and binds a particular vessel or not.

[6] By a "personal contract" we understand to be meant a contract made by the person or corporation to be bound as distinguished from one imputed to such person or corporation. In Great Lakes Towing Co. v. Mill Transportation Co., supra, the court said:

"The contracts of the manager are the actual contracts of the owner, and are not of the same character as the contracts of the master made on a voyage or in foreign ports, and which are imputed to the owner from the necessities of commerce. The acts of the managing agent within the sphere of authority are as much the acts of the owner as if done by the owner himself. Only upon this theory could a corporation make what, for the purpose of making a distinction, is called a personal contract; that is to say, one which the owner himself or itself has made."

The argument has been advanced that the contract herein involved is in no way the personal contract of the respondent, and that no accident of signature either to the charter party or the bill of lading can make it a personal contract. It is said that it is such a contract as is incident to the ownership of vessels. But this is a case where the managing owner of a vessel personally negotiated and signed the contract, charter party, which contained a provision that the vessel should be "tight, staunch, strong, and in every way fitted" for the voyage. It purported to be made between the libelants and Pendleton Bros., agents of the schooner Edith Olcott, and was signed, "Pendleton Brothers, Benner Line." As the respondent, the principal owner of the vessel, personally signed it as his own agent, he bound himself. The fact that it was the ordinary case of a charter party binding the ship does not prevent its being the personal contract of Pendleton Bros.

The decree of the court below limiting the liability of the respondent Fields S. Pendleton to his interest in the schooner Edith Olcott and her freight pending for the voyage mentioned in the pleadings, and separately dismissing the libel as against the said Fields S. Pendleton, must to that extent be reversed, with costs. The amount due on the claim of the appellant will be ascertained, and such further proceedings had as the rules and practice of the court require.