## THE ASUARCA.

(District Court, S. D. New York. February 24, 1921.)

1. **Shipping ⬥121(1)—Ship held liable for damage to cargo as due to "unseaworthiness"; "peril of the sea."**

Damage to cargo of a steamship by seawater, which escaped from a ballast tank through giving way of the gasket between the tank and cover, *held* on the evidence, which showed that the vessel encountered only such storms as were to be expected at the season, and was otherwise uninjured, not due to "perils of the sea," but to "unseaworthiness," which rendered her liable therefor.

[Ed. Note. —For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea; Unseaworthy.]

2. **Shipping ⬥137—Damage to cargo held not caused by fault in management of vessel.**

The fact that leakage from a ballast tank drained into the bilges, and from there overflowed into the hold, where it damaged cargo, *held* not to exonerate the ship from liability, under Harter Act, § 3 (Comp. St. § 8031), on the ground that the damage was caused by failure to keep the bilges pumped, which was a fault in navigation.

3. **Shipping ⬥132(5)—Damage to cargo held due to sweating, and within exceptions in bills of lading.**

Damage to shipment of paprika *held*, on the evidence, due to sweating, and within the exceptions in the bill of lading.

In Admiralty. Suits by T. M. Duche & Sons, by Habicht, Braun & Co., by O. Scherer & Bro., by Stone, Timlow & Co., by R. M. Evans and another, by Dungan, Hock & Co., by D. Filmer, and by G. Da Luca & Co. against the steamship Asuarca; Hijos de Jose Taya S. en C., claimant. Decrees for libelants. Decree for respondent.

Decree affirmed 291 Fed. 77.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Harrington, Bigham & Englar, of New York City (T. Gatesby Jones, of New York City, of counsel), for libelants.

Kirlin, Woolsey, Hickok, Campbell & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for claimants.

KNOX, District Judge. Libelants were consignees of certain merchandise carried from Spanish ports to New York by the steamship Asuarca on a voyage that began at Barcelona on January 23, 1917, and ended at this port on February 22, 1917. The several actions were consolidated upon the trial. The circumstances having to do with the merchandise of Gaetano da Luca differ somewhat from those which control the decision upon the other libels, and will be the subject of subsequent comment herein.

[1] The several bills of lading issued upon the shipments show the same to have been received by the ship "in apparent good order and condition." Upon the delivery of the goods at this port they were found to be badly damaged by seawater. It is undisputed that the water giving rise to the damage gained entrance to the hold, wherein the cargo in controversy, saving that of Da Luca was stowed, from one of the manhole doors of a ballast tank in No. 3 hold.

During the voyage the gasket, placed between the cover to the manhole and the top of the tank for the purpose of preventing the leakage of water, gave way in such manner as to flood the bilges and soak the cargo. The steamship company, under the bill of lading, was not to be responsible "for damages or losses occasioned by sea, winds, * * * and other unforeseen cause, * * * nor for effects of climate, overheating of the holds, humidity. * * *"

It is defended that the vessel was in all respects seaworthy, that her owners exercised due diligence to put her in that condition, and, further, that the damage was due to the perils of the sea, default or error in judgment in the navigation or management of the ship, latent defects undiscoverable by the exercise of reasonable diligence, and overheating of holds, and humidity. The manhole cover was fitted to be fastened to the tank top with the customary dogs and screw bolts, and, as is usual, a gasket or packing soaked in white lead was placed around the rim of the tank and its cover; the latter then being tightly screwed into position, so as to make a waterproof joint.

Immediately before starting upon the voyage in question, the Asuarca was in dry dock at Barcelona. At that time the tanks and their covers were inspected and fitted with new packing. Upon being returned to the water, and while she was light, the ship's ballast tanks were filled. The manhole lids were again examined and found not to be leaking. There is some testimony to the effect that the manhole cover which later gave trouble was fitted with metallic rubber. If this were the fact, it would in the opinion of the experts account for the leakage, inasmuch as the wire mesh within the rubber would prevent a sufficiently tight joint being made. This testimony may be passed, for the reason that the great weight of the evidence indicates that a proper material was used for packing.

The only fault to be found with what was done at Barcelona is that the tank top covers were not tested and inspected with a pressure of

water thereon equivalent to that which would be experienced when the ship was loaded and at sea. Such test and inspection might have been had by increasing, to the point of overflowing, the head of water in the sounding pipes. When the vessel was light, with her tanks filled, the pressure of water on the tank top would be about 10 pounds per inch; at sea and loaded, the pressure would increase to about 13½ pounds per inch. Had the sounding pipes been filled in the manner suggested, it is doubtful, I think, if upon test the manhole cover would have shown leakage. Such a slight increase in pressure would not be likely to have then disclosed any defect in the packing, and thus have made it possible to avert what afterwards came to pass.

The inspection being complete, cargo was taken aboard and the vessel got under way for New York. On the way over two storms were encountered. The first came on the 16th and 17th of February, and was described by the ship's master as being "an ordinary sort of an Atlantic storm." It shook up the ship and pitched her up and down, and "she took water over the decks," the ship rolling from 28 to 30 degrees. The wind was "very strong," reaching a velocity, the master estimates, of 50 miles per hour. During the continuance of the storm the ship's propeller was frequently out of water, and a man remained constantly at the "butterfly" to slacken speed, and thus reduce the vibration from the propeller when freed from the water. At one time the speed was such that the ship failed to respond to her rudder, and she was thereby subjected to heavy seas. More speed was put on, and the vessel righted herself and proceeded. On this day, however, she covered only 52 miles, as against an average of slightly over 100 miles per day. As to possible damage to ship or cargo, the master entered a protest in his log. The second storm occurred on the 20th and 21st of February, and this the master characterized as a "common storm." The ship's experience was not unlike that described above; the storm, nevertheless, being of shorter duration.

It cannot be said that the storms were of unusual severity. The ship's officers, indeed, admit the weather conditions to have been those ordinarily to be expected in the North Atlantic in January and February. On arrival here the Asuarca gave some outward appearance of having been through rough weather; aside, however, from the manhole leakage in her tank top, which was not discovered until the vessel discharged, she was intact, staunch, and tight. This in itself is, to my mind, some evidence of unseaworthiness in the part of the ship where trouble occurred. In The Rosalia (C. C. A.) 264 Fed. 285, Judge Hough said:

"It is true that the strain of a long-continued storm may injure some one piece of apparatus, good of its kind, while leaving the rest of the ship substantially unhurt. The Charlton Hall, 207 Fed. 343; 125 C. C. A. 116, is an example. But this is very rare. * * *"

This case bears some resemblance to The Charlton Hall. There the tank top itself had buckled, and so deformed the manhole cover as to permit it to leak. It was held by the Circuit Court of Appeals, one judge dissenting, that the cargo damage arising from the leak was "a peril of the sea." There was also evidence that the cement between

14 frames on the port side of the vessel was cracked and broken, some of it badly. Here, also, there is evidence of cracked cement, but it is limited to cement on top of the manhole. Such cracking is easily accounted for by the mere fact of leakage, and was not necessarily due to strain.

The Asuarca undoubtedly labored heavily in riding out the storm she encountered, but I cannot find that the strain occasioned thereby brought about the leaky manhole. None can tell at what stage of her voyage the leakage began; it may have been before or after the first storm. If so, the trouble is attributable, not to a peril of the sea, but to unseaworthiness. If the leak was sprung during the storms, the evidence does not make out a case of perils of the sea.

It is my opinion that there was some defect in the packing itself, or in the tightening up of the dogs and screw bolts. Such defect, being latent, was doubtless not to be discovered by the diligence and care exercised by those who inspected the vessel at Barcelona. It was, however, sufficient to cause damage to the cargo, once the vessel was subjected to the strain reasonably to be expected upon her voyage.

I think the facts of the present case, particularly since there is no exemption from liability from latent defects, bring it within the authority of The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. And since, under The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, "the warranty [of seaworthiness] is absolute * * * and does not depend on [the owner's] knowledge or ignorance, his care or negligence," I must find the Asuarca to have been unseaworthy with respect to her manhole cover at the time she set sail.

[2] Counsel for the ship and claimants suggests that, even though I find unseaworthiness, the vessel should none the less be exonerated under the provisions of the Harter Act (Comp. St. §§ 8029–8035). This contention is put forth, inasmuch as the leaking tank drained into the bilges, causing them to overflow and flood the cargo. From this it is argued that the damage was caused from a fault in the management of the vessel in failing to pump out the bilges. The Manitoba (D. C.) 104 Fed. 145, and Int. Nav. Co. v. Farr & Bailey Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830, make it impossible for me to adopt the argument.

Each of the libelants, with the exception of Da Luca, is entitled to a decree.

[3] The shipment of Da Luca consisted of 200 bags of paprika. It was stowed in No. 2 hold and far away from the cargo damaged by the leaking manhole. It would have been impossible for the paprika to have been injured from that cause. Notwithstanding, the paprika showed the presence of salt. Claimant's cargo surveyor attributed the paprika's injury to sweat. He accounts for the salt by suggesting that the sweat partially came from the hatchways covered by tarpaulins, which carried salt. There is no evidence to the contrary, and I shall accept the testimony. Sweating of cargo is within the exceptions of the bill of lading, and there is no evidence of negligence upon the part of the ship, and I shall dismiss the Da Luca libel with costs.

Reference is made in claimants' brief to a libel filed by Frederick

Farone. I am unable to find any testimony in connection therewith in the present record. If counsel for libelant agree with the statement of claimants' counsel that the Farone shipment sustained no damage, that libel may also be dismissed.