## THE ARAKAN.

(District Court, S. D. California. N. D. January 5, 1926.)

No. 17865.

**1. Shipping ⊗═141(3)—Where weather encountered was of kind reasonably to have been expected, it was not "peril of the sea."**

Where weather encountered was of a kind reasonably to have been expected, it was not a "peril of the sea," so as to exempt ship from liability for damage to cargo.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

**2. Shipping ⊗═132(4)—That ship was damaged in only one place held to indicate unseaworthiness, rather than damage from peril of sea, force of which may be overcome only by convincing evidence.**

On libel for damages to consignment of oil, that ship was damaged in only one place was suspicious circumstance, indicating unseaworthiness rather than injury resulting from peril of the sea, force of which may be overcome only by convincing evidence.

**3. Shipping ⊗═137—Harter Act (Comp. St. §§ 8029–8035) merely permits insertion in bill of lading of clause reducing absolute warranty of seaworthiness, but does not serve as its equivalent.**

Harter Act (Comp. St. §§ 8029–8035) merely permits insertion in bill of lading of clause reducing absolute warranty of seaworthiness, usually implied in contract of marine transportation, but does not serve as its equivalent.

**4. Shipping ⊗═121(1)—Carrier's agreement to obtain surveyor's certificate that ship's tanks were fit to convey cocoanut oil held not to limit implied absolute warranty of seaworthiness.**

Letter to shipper, wherein carrier agreed to have vessel's tanks inspected by licensed surveyor, and to obtain certificate that they were fit to convey cocoanut oil in bulk, held not to limit absolute warranty of seaworthiness, otherwise implied.

**5. Pleading ⊗═36(3)—Admission in answer that leakage in ship's tank, causing damage to consignment of cocoanut oil, was due to latent defect, held to constitute admission of liability.**

Admission, in answer to libel for shortage and contamination of cocoanut oil caused by leakage in ship's tank, containing such oil, that leakage was caused by latent defect, held to constitute admission of liability.

**6. Shipping ⊗═132(3)—Burden is on carrier to show cause of damage to cargo, and to prove that it is one for which it is excused from liability.**

Burden is on carrier to show cause of damage to cargo, and to prove that it is one for which it is excused from liability, and shipper need not prove in what respect vessel is unseaworthy, or even that it is unseaworthy.

**7. Shipping ⊗═132(4)—Evidence held to show that damage to consignment of cocoanut oil was due to unseaworthiness of vessel.**

Evidence *held* to show that damage to cocoanut oil, shipped in ship's tank, from leakage and contamination, was due to unseaworthiness of vessel.

**8. Shipping ⊗═120—Shipowner must use due care to ascertain physical propensities of commodity, and take steps to prevent delivery in faulty condition.**

Shipowner has duty to use due care to ascertain physical propensities of commodity intrusted to him for carriage, and to take proper steps to prevent consignment being delivered in faulty condition.

**9. Shipping ⊗═121(2).**

Ship's tank, from which no liquids, except cocoanut oil, are likely to escape, is unseaworthy for carriage of cocoanut oil.

**10. Shipping ⊗═123.**

Single-riveted slack tank of ship is not proper place to carry oil.

In Admiralty. Libel by Vincente Madrigal, doing business as Madrigal & Co., against the Dutch steamship Arakan, her engines, boilers, tackle, apparel, and furniture; the Rotterdamsche Lloyd, claimant. Decree for libelant.

Bell & Simmons and Goldman, Nye & Surr, all of San Francisco, Cal., for libelant.

Frank & Frank, Irving H. Frank, and Keith Ferguson, all of San Francisco, Cal., for claimant.

KERRIGAN, District Judge. In the present action libelant seeks a recovery for shortage in, and delivery in a contaminated and damaged condition of a portion of, a consignment of 864 tons of cocoanut oil, shipped from Cebu in the deep tank of claimant's steamer Arakan in 1923. While on the voyage, certain of the after bulkhead rivets in this tank developed leaks, through which oil seeped into the double bottom tank and bilges. Most of that which escaped was recovered and salvaged, but, due both to contamination and the process of salvaging, only at a substantial loss.

[1] Claimant's initial position is that the leakage resulted from "heavy, tempestuous, and extraordinary" weather, amounting to a peril of the sea, which as such would be excused by the provisions of its bills of lading. This defense, to say the least, is without novelty; it is the carrier's best, though least dependable, friend. Judged by well-known and usually adopted tests, it must fail in this case, because it is apparent from the evidence that the weather encountered by the vessel, if not actually anticipated, certainly

was of a kind reasonably to have been expected on a trans-Pacific voyage, and hence not a peril of the sea. The Charlton Hall (D. C.) 285 F. 640, 642; Benner Line v. Pendleton (C. C. A. 2) 217 F. 497, 503, 133 C. C. A. 349; affirmed 38 S. Ct. 330, 246 U. S. 353, 62 L. Ed. 770. There was, in brief, nothing "catastrophic" about it. The Charlton Hall, supra; The Rosalia (C. C. A. 2) 264 F. 285, 288.

[2] The additional fact is to be noted that, aside from the leaks referred to in one bulkhead of a single tank, the ship was in no way damaged. As I held in The Mursa (Newhall v. United States Shipping Board Emergency Fleet Corporation) 8 F.(2d) 422, the fact of damage in only one place is a suspicious circumstance, indicating unseaworthiness, rather than injury resulting from a peril of the sea. Its force may be overcome only by convincing evidence, and that has not been done here.

The contract under which shipment of the oil was made consists of a letter and four bills of lading. The letter provides, among other things, that "the steamer will ventilate tanks prior to vessel's arrival at port of loading, and that a licensed surveyor inspect the tanks and issue a certificate to the effect that they are in satisfactory condition for the conveyance of cocoanut oil in bulk." It is admitted that a licensed surveyor inspected and applied a hydrostatic test to the deep tank of the Arakan at Cebu, and that he certified it to be "in a fit and sound condition to carry a cargo of cocoanut oil." Libelant insists, however, that it was in fact unseaworthy.

[3, 4] The bills of lading do not themselves contain any clause reducing, or attempting to reduce, the absolute warranty of seaworthiness usually implied in a contract of marine transportation, and of course the Harter Act (Comp. St. §§ 8029–8035) only permits the insertion of such a clause, but does not serve as its equivalent. Hughes on Admiralty (2d Ed.) § 95; The Carib Prince, 18 S. Ct. 753, 170 U. S. 655, 662, 42 L. Ed. 1181. Claimant argues, however, that the warranty was limited by the terms of its letter above set forth, and that in consequence it was obliged only to perform the acts therein referred to, because the letter constituted at the same time an abrogation of the warranty and a substitution therefor of certain standards of "due diligence."

The question presented is this: Whether or not a carrier's agreement to do certain acts, intended to make its vessel seaworthy, will operate to modify the absolute warranty of seaworthiness which its contract otherwise imports. The answer of the Circuit Court of Appeals of the Second Circuit is negative, for "a provision in a contract requiring precautions to prevent injury is not meaningless, even though other provisions insure compensation in case of injury," and hence it is not "necessary to narrow the warranty to give it meaning." Church Cooperage Co. v. Pinkney, 170 F. 266, 269, 95 C. C. A. 462, 465. Since the provision was one inserted by the carrier itself, and is not inconsistent with the warranty, it must be held not to have limited it.

[5] Hence the claimant must show that the tank in which it carried libelant's cocoanut oil was, in actual fact, seaworthy for the transportation of that commodity. Its answer sets up that the leakage was caused by a latent defect. Passing this admission, which as a result of the foregoing considerations amounts to one of liability (The Asuarca [D. C.] 291 F. 73, 74, 76, affirmed [C. C. A. 2] 291 F. 77; Benner Line v. Pendleton [C. C. A. 2] 217 F. 497, 500, 501, 133 C. C. A. 349, affirmed, 38 S. Ct. 330, 246 U. S. 353, 357, 62 L. Ed. 770), it is necessary to determine, as nearly as possible, what the actual causes of the leakage were, and whether or not they existed at the inception of the voyage.

Cocoanut oil, as has been judicially said of petroleum, "is much more difficult to contain than water. Small leaks in a water tank tend to correct themselves by the formation of rust; whereas, oil not only does not cause rust, but tends to dissolve" it. The Turret Crown (C. C. A. 2) 297 F. 766, 768, 775, 1924 A. M. C. 254, 255, 263. One of the libelant's witnesses, who had handled shipments of 300,000 tons of cocoanut oil within the last eight years, and whose experience with petroleum cargoes was even more extensive, testified that a tank which was proved water-tight by a hydrostatic test might be insufficient to contain either species of oil, and that, of the two, cocoanut oil is the more penetrating and difficult to contain.

The deep tank, which received the consignment here in question, was as wide as the ship and located immediately beneath its 'tween deck. It was approximately 21 feet deep and single-riveted. The oil, which was introduced in liquid form, filled it only to within about 40 inches of the top. Of the 37 tons which escaped from it, 2 went through leaks in the after bulkhead into the No. 4 hold bilges, and 35 were found in the double-bottom tanks, to which they had found egress through leaks in the riveting which fastened

that bulkhead to the ship's sides and double-bottom tanks.

Libelant maintains that the deep tank was unseaworthy for the carriage of cocoanut oil in bulk; that despite the favorable result of the water test made before sailing, as the second hydrostatic test conclusively proves, at the time of arrival in San Francisco Bay it was insufficient even to contain water; and that this condition may be accounted for only on one of two hypotheses, on either of which claimant is liable: Either there were leaks existing at the commencement of the voyage, which at that time were stopped with rust (which later dissolved), or the oil was stowed in such a manner as to permit it to move about, and thus to create leaks, during the 10 or 11 days in which it remained in a liquid state after the vessel left Cebu.

[6, 7] It is, of course, unnecessary for him to show in what respect there was unseaworthiness, or even that it existed at all. The burden is on respondents to show what caused the loss, and to prove that it is one for which they are excused. The Mursa, supra. But, in my opinion, unseaworthiness actually has been made out, for the dilemma proposed by libelant cannot be avoided.

[8, 9] Even were this a question of negligence, claimant would have been under a duty to use due care to ascertain the physical propensities of every commodity entrusted to it for carriage, and to take appropriate steps to prevent its being delivered in faulty condition. The Willfaro-Willsolo (D. C.) 9 F. (2d) 940, 1925 A. M. C. 998, 1001, affirmed 9 F.(2d) 622, 1926 A. M. C. 32. Since, however, the question is only one of seaworthiness, it need merely be said that a tank from which none of the liquids on earth except cocoanut oil are likely to escape is unseaworthy for the carriage of cocoanut oil.

[10] On the question of stowage, there can be no doubt that a slack tank, single-riveted, is not the proper place to carry oil. Claimant's marine surveyor at Cebu made no inspection of the Arakan's deep tank after it had been loaded, and did not approve of its being partially empty. The dangers of leaving it in such a condition are obvious, and apparently well recognized. A full tank, which is kept "pressed up," is subject to no great risk. One which is not entirely full, if single-riveted, is extremely likely to be damaged in weather such as that encountered on the voyage now in question.

If the vessel was unseaworthy as to her deep tank before it was loaded, because it was not cocoanut oil tight, she was the more unseaworthy afterwards. If the tank itself

was seaworthy, its loading rendered it unseaworthy. Apart from these considerations, the loss has not been explained, and on well-established principles for that reason must be borne by claimant.

The order, therefore, is that libelant have a decree for $3,903.84, with interest and costs.